**Paul Anthony BROWN, Petitioner,**

v.

**Cal TERHUNE, Director of the California Department of Corrections; Roy Castro, Warden, High Desert State Prison, Respondents.**

No. C–98–2318–SI.

United States District Court,
N.D. California.

Sept. 6, 2001.

E. Evans Young, Oakland, CA, for Petitioner.

Bruce Ortega, Bill Lockyer, CA Attorney General, CA Attorney General's Office, San Francisco, CA, for Respondents.

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING REQUEST FOR EVIDENTIARY HEARING**

ILLSTON, District Judge.

Currently before this Court is petitioner Paul Anthony Brown's second amended petition for a writ of habeas corpus under 28 U.S.C. § 2254. The parties have fully briefed the merits of this petition, and Brown has requested an evidentiary hearing. After considering the arguments of the parties, this Court hereby DENIES petitioner's petition for writ of habeas corpus and DENIES petitioner's request for an evidentiary hearing.

## BACKGROUND

On February 18, 1992, at approximately 9:15 p.m., a man armed with a Calico .9 millimeter semi-automatic or automatic weapon entered Bosn's Locker bar in North Oakland and sprayed the bar with 49 rounds of ammunition; seven individuals were hit by gunshots, three of whom were killed.

### A. Procedural History

On September 24, 1992, Brown, along with co-defendant Keith Barber, was charged by information with three counts of murder, one special circumstance of multiple murder, and four count of attempted willful, premeditated murder, along with other allegations. Trial in Alameda County Superior Court began on July 27, 1993. On September 8, 1993, the jury informed the trial court that it was deadlocked as to both defendants and the court declared a mistrial. On November 10, 1993, the court granted the prosecution's motion to dismiss all charges against Barber.

On March 7, 1994, Brown's second trial began. On March 29, 1994, the jury returned guilty verdicts on three counts of murder in violation of California Penal Code § 187 and four counts of willful and deliberate attempted murder under California Penal Code §§ 187 and 664. The jury also found true a multiple murder special circumstance allegation (Cal.Penal Code § 190.2(A)(3)); that Brown personally used a firearm in the commission of all the offenses (Cal.Penal Code § 12022.5); and that Brown inflicted great bodily injury during the commission of two of the four attempted murders (Cal.Penal Code § 12022.7). After the verdict and before the penalty phase, Brown made a *Marsden*[1] motion based on trial counsel Are-

---

**1.** *People v. Marsden,* 2 Cal.3d 118, 84 Cal. Rptr. 156, 465 P.2d 44 (1970).

lene West's failure to investigate and present testimony by a witness named King McCarthy. West had been retained by Brown during municipal court proceedings and then appointed once Brown could no longer pay for her services. After holding a hearing on the issue, the trial judge denied Brown's *Marsden* motion.

On April 11, 1994, the penalty phase began. On April 21, 1994 the jury returned a verdict of life without the possibility of parole. After the jury's verdict, Brown renewed his *Marsden* motion, and a hearing was held on May 20, 1994. The court again denied Brown's motion. On July 6, 1994, the trial court denied Brown's motion for a new trial and motion to reduce the attempted murder verdicts, and sentenced him to three life terms without the possibility of parole for the three first degree murder convictions, with four year enhancements for firearm use on all three counts. The court also imposed life terms for the four counts of attempted murder, with four year enhancements for firearm use on all four counts, and three year enhancements for each of the two findings of infliction of great bodily injury The court ordered all sentences to be served concurrently to the first sentence of life without the possibility of parole. Brown is currently incarcerated at High Desert State Prison in Susanville California.

**B. Evidence at Trial**[2]

Two individuals who were in the bar at the time of the shooting later served as witnesses for the prosecution at Brown's criminal trial. Winnie Tomlin, who was standing ten feet from the door through which the gunman entered, saw a tall man enter and, although her view of the gun

was obstructed, heard the shooting begin. She testified that she looked into the face of the gunman for four or five seconds, and that the area where the gunman was standing was well lit by the disk jockey's equipment. Following the shooting, Tomlin was sent to the hospital to treat a superficial chest injury caused by the ricochet of a bullet, where she was administered a tranquilizer to calm her hysteria. Two hours after the shooting, she was interviewed at the hospital by Officer Joyner and she provided a physical description of the shooter: he was a dark-complexion black male, 18 to 25 years old, five feet eight inches tall, and 150 to 160 pounds, and wore a green hat with a bill, clear plastic goggle-type glasses, and a multi-colored jacket. Two days after the shooting, Tomlin identified Brown as the shooter out of a photographic lineup but would not sign the back of the photograph, telling the homicide detective that she was not sure of her identification. Tomlin later claimed to have been afraid to identify Brown rather than uncertain. Tomlin also told a therapist that she could identify the gunman but did not want to do so. After Tomlin was subpoenaed to testify at a preliminary hearing, she informed defense counsel that she was unable to identify the shooter. She was not called to testify at the preliminary hearing. However, subsequently, Tomlin identified Brown as the gunman, attributing her change of heart to her anger at the deaths of two friends in the Bosn's Locker shooting. At trial, Tomlin testified that the gunman was tall, thin, light-skinned and dark around the beard area; that he wore a cap and a nylon jacket with green in it; and that he wore clear goggles over his eyes that were

---

**2.** The government contends that the jury verdict and findings require this Court to presume that the facts presented by the prosecution were true under 28 U.S.C. § 2254(e)(1). However, that statutory provision refers to

factual findings by a court, not to a general jury verdict that renders it impossible to determine which witnesses or evidence the jury credited.

similar to plastic safety glasses used for target practice.[3] She identified Brown as the shooter. Tomlin was impeached by Tommietta Winston, a defense witness who had been with Tomlin at Bosn's Locker on the night of the shooting, who testified that Tomlin told her she could not be sure of her identification of the gunman.

Vernon Wallace, who had consumed three or four drinks before the shooting, hit the floor at the moment that the shooting began. At trial he testified that, after a few seconds, he crawled into a position where he could see the right profile of the gunman, whom he described as wearing a black pullover hat, like a ski mask rolled up, so that Wallace could only see his eyes. The gunman was approximately 16 to 18 feet away but the disk jockey's lights enabled him to view the shooter. After the shooting, Wallace described the gunman as light skinned and approximately six foot one or two. The next day, Wallace picked Brown's picture out of a photographic lineup. At trial, he identified Brown as the shooter. However, he was impeached with a number of prior inconsistent statements. When he called 911 immediately following the shooting, Wallace stated that he had not seen the gunman and could not identify him. His first description of the shooter to the police did not mention a ski mask, but stated that a black turtleneck pulled up just beneath the eyes hid most of the shooter's face. At the preliminary hearing, Wallace did not mention a ski mask and stated that he could not identify Brown as the shooter. At an evidentiary hearing, Wallace stated that the shooter had green eyes and identified Barber as the shooter, changing his mind only after the prosecutor showed him his signature on the back of Brown's photograph in the lineup. It was at that evidentiary hearing that Wallace first mentioned the ski mask.

Gwendolyn Williams also testified for the prosecution. She testified that on the night of the shooting she had been talking to her friends "Linda, Faye and Mary" on Faye Jamerson's porch, approximately one block from Bosn's Locker. Some time after 8:30 p.m., Brown drove up in a white Corvette and stopped to talk to Williams. Michael Baxter came by and told Brown, "There is some dude sitting in the bar." Brown walked in the direction of Bosn's Locker, and was gone for approximately ten minutes. When he was gone, Williams heard something that sounded like firecrackers. When Brown returned, he asked, "Did you hear that?" and told Williams that the sounds were gunshots. He then said, "I'm outta here," and drove away in his car. Williams stated that Brown did not have a gun with him that night.

Williams' testimony was impeached by Faye Jamerson and Mary Whitehead,[4] who testified that they had not been with Williams on the night of the shooting Jamerson testified that she had been in Arkansas attending her brother-in-law's funeral at the time of the shooting. After she had completed her testimony, and the defense tried to introduce the funeral program into evidence, the court noticed that the funeral service actually took place in Texas; the prosecution then successfully moved to introduce this exhibit to impeach Jamerson's testimony and referenced this discrepancy in discrediting her testimony during closing arguments. Jamerson was not recalled to explain the discrepancy because she was ill; instead, in her closing, defense

---

3. Brown is 6' 2", weighed 185 pounds, and is of light complexion.

4. At the first trial, Linda Wadsworth and Faye Jamerson testified. Jamerson testified that she was in Arkansas after attending a funeral, and Wadsworth testified that she was home asleep until after the shooting. (Ex. A at 4372, 4381–85).

counsel suggested that Jamerson might have gone from the funeral in Texas to visit her family in Arkansas. Whitehead testified that on the evening of the shooting, which took place on her wedding anniversary, she was at the Greyhound bus station picking up her grandchildren who had been on a school outing, and that at the time of the shooting she had gone to Safeway. During cross-examination, she could not remember her grandson's name.

The prosecution also called Michael Baxter as a witness, who testified that he had not seen or spoken with Brown the day of the shooting. The prosecution then impeached Baxter with the fact that he had dealt crack cocaine for Brown for three months prior to the shooting. Baxter testified that during this time period he made a few hundred dollars while Brown made $3000 to $4000 from drug dealing activities. The court advised the jury that this evidence was relevant only to Baxter's credibility.

Officer Gus Galindo of the Oakland Police Department testified that he arrested Brown three days after the shooting. He had also stopped Brown the day before his arrest, at which time he observed "a black knit-like skull cap" in Brown's car. A black ski mask was seized from Brown's car after his arrest.[5] When Brown was notified that he had been arrested on charges of murder and attempted murder, he responded that "he did not care what he was arrested for, that it was no big deal."

## C. Post–Trial Appeals

On November 22, 1996, the California Court of Appeal modified petitioner's sentence by striking six of the gun use enhancements but otherwise affirmed the judgment. On March 12, 1997, the Cali-

fornia Supreme Court denied Brown's petition for review without explanation. On March 9, 1999 the California Supreme Court denied a petition for a writ of habeas corpus without any briefing or issuance of an order to show cause.

On March 24, 1999, Brown filed an amended petition for writ of habeas corpus in this court, and an order to show cause was subsequently issued. On August 5, 1999, respondents filed a motion to dismiss the habeas petition on the ground that petitioner had failed to exhaust his state remedies for two of the claims asserted in his petition. After considering the arguments of both parties, on October 6 1999 this Court granted respondents' motion to dismiss but allowed petitioner leave to amend his petition to include only exhausted claims. On October 19, 1999, petitioner filed a second amended petition for writ of habeas corpus omitting the unexhausted claims, and on October 27, 1999 this Court issued an order to show cause. Respondents filed their answer on January 4, 2000. On February 8, 2000, Brown filed a traverse and a request for an evidentiary hearing. Brown filed a motion seeking leave to conduct a deposition of witness King McCarthy on June 1, 2000. On June 8, 2000, the Court granted Brown's motion for leave to conduct the deposition and request for financial assistance to conduct the deposition. On July 7, 2000, August 21, 2000 and September 19, 2000 Brown filed motions seeking extensions of time to submit evidence in support of his request for an evidentiary hearing. The first two requests were granted by the Court, but on February 2, 2001, the Court denied the third request for an extension of time. As of this date, Brown has not sought leave to submit additional evidence in support of

---

**5.** There was additional evidence presented showing that Brown had previously had such a has Brown's mother testified that he regu- larly wore a ski mask rolled up like a beanie cap to keep himself warm.

his request for an evidentiary hearing. Brown's current petition alleges twelve grounds for relief.

## LEGAL STANDARD

A petition for writ of habeas corpus may be granted "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies to this petition for habeas corpus, since it was filed after the AEDPA's effective date of April 24, 1996. *See Lindh v. Murphy*, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). In relevant part, 28 U.S.C. § 2254, as amended by AEDPA, states:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim ... (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

The Supreme Court recently explained that the "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have independent meaning:

> A state court decision will be "contrary to" our clearly established precedent if the state court either "applies a rule that contradicts the governing law set forth in our cases," or "confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different

from our precedent." [citation]. A state court decision will be an "unreasonable application of" our clearly established precedent if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." [citation].

> "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." [citation]. Distinguishing between an unreasonable and an incorrect application of federal law, we clarified that even if the federal habeas court concludes that the state court decision applied clearly established federal law incorrectly, relief is appropriate only if that application is also objectively unreasonable. [citation].

*Penry v. Johnson*, —— U.S. ——, 121 S.Ct. 1910, 1918, 150 L.Ed.2d 9 (2001) (discussing *Williams v. Taylor*, 529 U.S. 362, 404–11, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). The Ninth Circuit further interprets the "unreasonable application" clause to call for clear error analysis:

> Under AEDPA we must reverse a state court's decision as involving an "unreasonable application" of clearly established federal law when our independent review of the legal question does not merely allow us ultimately to conclude that the petitioner has the better of two reasonable legal arguments, but rather leaves us with a "firm conviction" that one answer, the one rejected by the court, was correct and the other, the application of the federal law that the court adopted, was erroneous—in other words that clear error occurred.

*Van Tran v. Lindsey*, 212 F.3d 1143, 1153–54 (9th Cir.2000).

■ Assuming constitutional error occurred, habeas relief still cannot be granted unless the error had "a substantial and injurious effect or influence in determining

the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623, 113 S.Ct. 1710, 1718, 123 L.Ed.2d 353 (1993). *See also Shackleford v. Hubbard*, 234 F.3d 1072, 1079 (9th Cir.2000) (error which is harmless under *Brecht* analysis is not "contrary to" or "unreasonable application" of clearly established federal law); *Bains v. Cambra*, 204 F.3d 964, 977 (9th Cir.2000) (*Brecht* standard applies to all § 2254 cases).

## DISCUSSION

### A. Ineffective Assistance of Counsel

The Sixth Amendment guarantees the right to effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The *Strickland* framework is considered " 'clearly established Federal law, as determined by the Supreme Court of the United States, for the purposes of 28 U.S.C. § 2254(d) analysis.' " *Wilson v. Henry*, 185 F.3d 986, 988 (9th Cir.1999). Under AEDPA, a state court's *Strickland* analysis generally would not fall within the "contrary to" clause of § 2254(d), but should be analyzed under the "unreasonable application" prong. *Weighall v. Middle*, 215 F.3d 1058, 1061–62 (9th Cir.2000).

In evaluating the effectiveness of counsel, "[t]he benchmark for judging any claim for ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result." *Strickland*, 466 U.S. at 686, 104 S.Ct. 2052.

 To establish ineffective assistance of counsel ("IAC"), a petitioner must first demonstrate that counsel's performance was deficient by showing that counsel's performance fell below an objective standard of reasonableness. *Id.* at 687–88,

104 S.Ct. 2052. To counteract the unfair influence of hindsight, judicial scrutiny of counsel's performance must be highly deferential, and a court must indulge a strong presumption that counsel's conduct falls within the range of reasonable professional assistance. *Id.* at 689, 104 S.Ct. 2052. After establishing the deficiency of counsel's performance, a petitioner must then show that counsel's errors were so serious as to deprive him of a fair trial. *See id.* at 687, 104 S.Ct. 2052. While the petitioner need not show that counsel's deficient conduct more likely than not altered the outcome of the case, the petitioner must show that there is a reasonable probability that, but for counsel's deficient conduct, the result of the case would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* at 694, 104 S.Ct. 2052; *see also Brown v. Myers*, 137 F.3d 1154, 1157 (9th Cir.1998).

### 1. Failure to investigate and present King McCarthy's testimony (Claim 1)

According to Brown, his mother first informed his trial counsel, Arlene West, that King McCarthy might have exculpatory information in 1992.[6] Brown's mother has filed a declaration stating that in 1992 she learned of McCarthy's statements about the case in two ways: she heard from her cousin, Clarence Wells, that McCarthy had told her cousin's girlfriend, Germaine Baker, that he saw the shooters enter Bosn's Locker and that Brown was not present; and Jeffie Sanders, who worked a Oakland Bail Bonds, told Brown's mother that she had overheard McCarthy saying "they got the wrong man. He [Brown] showed up when everything was over." Pet. Ex. F (L. Brown

---

6. West does not contradict this, but has stated that she does not remember whether she was made aware of McCarthy during the preliminary hearing or the first trial. Ex. B at 2569; Pet. Ex. J (West Decl.) ¶ 6.

Decl.) ¶¶ 5–7. Baker Sanders and Wells have filed declarations confirming that they overheard these statements by McCarthy and informed Brown's mother. Pet. Ex. G (Sanders Decl.) ¶¶ 3–6; Ex. H (Baker Decl.) ¶¶ 4–6; Pet. Ex. I (Wells Decl.) ¶¶ 4–5. Upon learning of these statements, Brown's mother contacted McCarthy directly; she states that he told her that Brown had not been present when the shootings took place, and that he was willing to help but would speak only to West, who had represented him in the past in some criminal matters. Brown's mother informed West about McCarthy and gave her his phone number. Pet. Ex. F (L. Brown Decl.) ¶¶ 12, 14.[7] Brown and his mother contend that West assured them that she would investigate this witness, advised them not to speak with the defense investigator about McCarthy and specifically promised to call McCarthy as a witness during the second trial. Pet. Ex. F (L. Brown Decl.) ¶¶ 14, 17(2); Pet. Ex. N (P. Brown Decl.) ¶¶ 7, 10, 12.

At the *Marsden* hearings, West stated that she had spoken with McCarthy on the phone and that he had implied that he knew of an exculpatory witness but that he himself had not actually witnessed the events. Ex. B at 2570. West complained that she was unable to meet with McCarthy in person because he was "literally hiding out"—McCarthy failed to appear at three meetings that she had scheduled with him and moved from the area in an apparent attempt to avoid her and her investigator. She also stated that she had unsuccessfully attempted to contact McCarthy by driving by the school where he picked up his child on at least three occasions, and that she had never known his address and only recently learned his

phone number. Ex. B at 2570–71, 2575–76. West's May 1998 declaration sets forth the same explanation. Pet. Ex. J (West Decl.) ¶¶ 7–9. West's representations regarding her efforts to meet with McCarthy are contradicted by hearsay statements by McCarthy to Brown's mother, Baker, and another witness, Jacqueline Coleman; these witnesses claim that McCarthy told them that West was the one who failed to attend the arranged appointments. Pet. Ex. F (L. Brown Decl.) ¶ 15; Pet. Ex. H (Baker Decl.) ¶ 6; Pet. Ex. L (Olivier Decl.) ¶ 20.

After the defense rested but before the close of trial, West and/or T.J. Hicks, who had been employed as the investigator for the first trial, went to McCarthy's house to attempt to speak with him. When this effort failed, they pushed a subpoena through an open window. Pet. Ex. F (L Brown Decl.) ¶¶ 20–22; Pet. Ex. O (Hicks Decl.) ¶ 19; Pet. Ex. J (West Decl.) ¶ 11. After McCarthy failed to appear in response to this subpoena, West went to the trial judge to seek an arrest warrant. The court informed West that the witness's identity would be revealed to the district attorney if a warrant were pursued. Ex. B at 2571–72; Pet. Ex. J (West Decl.) ¶ 12. West decided not to seek a subpoena because she did not know whether McCarthy's testimony would be favorable and because the police or district attorney would have access to him before she would. Ex. B at 2571–72. Brown went along with this decision. Ex. B at 2571–72; Pet. Ex. J (West Decl.) ¶ 13; Pet. Ex. N (P. Brown Decl.) ¶ 17.

Brian Olivier, who replaced T.J. Hicks as the investigator for the second trial, was not told of McCarthy's existence until after the guilty verdicts were returned. Pet.

---

**7.** Brown's mother's declaration does not specify whether she told West about the witnesses to McCarthy's statements. West claims that she was unaware of these witnesses until the day before the first *Marsden* hearing, after the jury's verdict in the second trial. Pet. Ex. J (West Decl.) ¶¶ 14–15; Ex. B at 2572–73.

Ex. L (Olivier Decl.) ¶ 14.[8] After Brown's mother informed him of McCarthy's statements, Olivier interviewed Baker, Coleman and Sanders in April 1994. Pet. Ex. L (Olivier Decl.) ¶¶ 16–20. On June 9, 1994, Olivier spoke with McCarthy, who was reluctant to speak with him but stated that he saw the gunmen approaching Bosn's Locker, that he closed his eyes and then drove off, and that he could not tell whether Brown was one of the gunmen. He denied making the statements attributed to him by Baker, Coleman and Sanders, and stated that he had wanted to meet with West but was unable to get her to schedule an appointment. Pet. Ex. L (Olivier Decl.) ¶¶ 21–23. This evidence was submitted to associate counsel Robert Braverman, who told Olivier that he would not use the information to file a motion for a new trial because Brown would have a better chance of obtaining relief on appeal. Pet. Ex. L (Olivier Decl.) ¶¶ 24–25. West has submitted a memorandum documenting a telephone call that she received from McCarthy on June 10 1994, the day after Olivier spoke with him:

8. Brown's mother states that West told her not to tell Olivier about McCarthy. Pet. Ex. F (L. Brown Decl.) ¶ 17. West has responded that at the time she advised Brown not to speak with him. Olivier was serving as investigator for Brown's co-defendant, during the first trial. Pet. Ex. R (West Letter) ¶ 27.

9. There is no reasoned decision from a state habeas court explaining why Brown's ineffective assistance of counsel claim was rejected, because his state habeas petition was rejected by a one-line denial. Pet. Ex. D. However, in a *Marsden* hearing, required by *People v. Marsden*, 2 Cal.3d 118, 84 Cal.Rptr. 156, 465 P.2d 44 (1970), the defendant is allowed to state reasons why the trial court should discharge an appointed attorney and substitute another to represent the defendant. "[T]he decision to allow a substitution of attorney is within the discretion of the trial judge unless defendant has made a substantial showing that failure to order substitution is likely to result in constitutionally inadequate represen-

Mr. McCarthy called me and was upset. Mr. McCarthy said investigators keep telling him that he said "they got the wrong guy." He said that is not true because he wasn't able to see the two men at the crime scene. He said he was in his car in the parking lot the night of the murders, waiting for a friend, when a car pulled up and two men got out and they had ski masks on. He didn't see any guns and was not able to see their faces. The next thing he heard were gun shots and he drove away immediately.

Pet. Ex. S (memorandum).

■ Brown now argues that counsel was ineffective for: (1) failing to locate and interview McCarthy; (2) deciding not to have the trial court enforce the subpoena against McCarthy; and (3) failing to use the evidence gathered by Olivier in the motion for a new trial. In rejecting Brown's contention that the trial court erred by denying his *Marsden* motions to remove counsel,[9] the California Court of Appeal concluded that Brown had failed to

tation." *People v. Crandell*, 46 Cal.3d 833, 859, 251 Cal.Rptr. 227, 760 P.2d 423 (1988). Constitutionally inadequate representation can occur where the appointed attorney is not providing adequate representation or there is an irreconcilable conflict between defendant and counsel such that ineffective representation is likely to result. *Crandell*, 46 Cal.3d at 854, 251 Cal.Rptr. 227, 760 P.2d 423 (internal citations omitted). This California rule substantially parallels the one prescribed by the Ninth Circuit in *Hudson v. Rushen*. See *Chavez v. Pulley*, 623 F.Supp. 672, 687 n. 8 (E.D.Cal.1985). The trial court held two *Marsden* hearings discussing the majority of the allegations of ineffective assistance surrounding West's failure to locate and interview witness McCarthy and enforce the subpoena against McCarthy that Brown raises here. The trial court denied both motions, and the Court of Appeal upheld the trial court's determination that Ms. West's representation was not ineffective. The conclu-

demonstrate inadequate representation. The court reasoned that "[d]efense counsel's decision not to call McCarthy could have been made by a reasonably competent attorney acting as a diligent advocate" and had been explained in a "reasoned and credible" manner, and further concluded that Brown had not shown that had counsel acted differently a more favorable determination would have been likely. Pet. Ex. A (Calif.Ct.App.Decision) at 59. The court went on to consider Brown's argument that counsel was ineffective for failing to adequately investigate McCarthy, and concluded that West's perception that McCarthy would be "at best an unwilling if no hostile witness" rendered her decision not to force McCarthy's participation in the case a reasonable one. Pet. Ex. A at 60.

■ This Court concludes that the Court of Appeal's decision is not an unreasonable application on clearly established federal law. The government points out that the state courts that rejected Brown's *Marsden* claims credited West's representations as to the efforts that she made to contact McCarthy, the California Court of Appeal explicitly characterizing her explanation as "reasoned and credible" and the state trial court implicitly finding the same. These findings are entitled to deference and can be overcome only by clear and convincing evidence, which Brown has not produced. 28 U.S.C. § 2254(e). The evidence that Brown has submitted which contradicts West's explanation consists entirely of hearsay statements by individuals who claim that McCarthy claimed that West had failed to keep her appointments with him, which are not more persuasive than West's sworn testimony to the contrary. Furthermore, the hearsay evidence is further undermined by Olivier and

West's account of their conversations with McCarthy; they both claim that he denied having made the exculpatory statements that were attributed to him. Brown's second argument fails for the same reason. West has offered an explanation, found reasonable by the state courts, that she did not want to have McCarthy arrested because the prosecution would be able to speak with him first and she did not know what the nature of this testimony would be. Brown's response, that if West had conducted an adequate investigation she would have known what McCarthy's testimony would be, fails for the reasons previously articulated. Finally, Brown argues that McCarthy should have been compelled to testify in connection with the motion for a new trial, and that if he had denied making the exculpatory statements then other witnesses could have been called to testify about prior inconsistent statements. *See People v. Zapien*, 4 Cal.4th 929, 952, 17 Cal.Rptr.2d 122, 846 P.2d 704 (Cal.1993) (upholding multiple hearsay evidence as proof of statement that witness denied having made). The government responds that such evidence would have been insufficient to justify the grant of a new trial and that West was therefore not ineffective for failing to present this evidence if connection with the motion for a new trial. Even if McCarthy had testified favorably or if his failure to testify favorably was impeached by other witnesses, there is no reasonable probability that the trial court would have granted a motion for a new trial on this basis.

### 2. Failure to investigate and present evidence of Brown's whereabouts at time of shooting (Claim 2)

At the first trial, West called witnesses to establish that Brown arrived in the area

sions on the Court of Appeal represent a reasoned decision from a state court to which this Court will defer.

of Bosn's Locker shortly after the shootings. Angela Brown, who was attending a party next door to the bar, testified that after she heard gunshots she saw a man who was not Brown dressed in black running toward a burgundy colored car. Ex. A at 4483–84, 4539–42. She later saw Brown at the corner of 59th and Shattuck; he asked her, "What happened? Why is people making our neighborhood hot?" Ex. A at 4485–86. She also testified that she had been in Bosn's Locker that night. Ex. A at 4503. On cross-examination, the district attorney asked her to describe the bar's disk jockey, John Evaneski, who had been killed by gunshots that night; she responded, "an older man ... brown skinned with gray hair" and responded affirmatively to the question whether he was black. Ex. A at 4504. In his closing argument, the district attorney pointed out that Evaneski was Caucasian. Ex. A at 4799. Linda Wadsworth testified that she went outside and saw Brown drive up in his Corvette after the shooting, and that Brown stopped her at Whitney and 59th Street and asked her what was happening at the corner. Ex. A at 4383–85. Mary Randolph testified that she began driving south on Shattuck Avenue from Berkeley at approximately 9:15 p.m. and that at approximately 9:30 p.m. saw two or three black men hurriedly come from the area of Bosn's Locker and get into a dark red car that was stopped in front of the bar, then speed down Shattuck. Ex. A at 4462–67. The prosecution's closing argument stated that Randolph saw Brown, Barber and a third individual getting into the car after the shooting. However, Brown points out that Randolph's testimony was that the perpetrators sped southbound on Shattuck, the opposite direction from the location where Wadsworth and Angela Brown testified that they saw Brown shortly thereafter.

West decided not to present any witnesses who would put Brown in the area of the bar at the second trial. She therefore did not call Angela Brown, Wadsworth or Randolph. Brown's declaration states that he told her that he disagreed with this strategy. Pet. Ex. N (P. Brown Decl.) ¶¶ 15–16. Brown now argues that this decision was unreasonable because it was made without adequate investigation and because there was no reason to abandon a successful strategy from the first trial. Brown also faults West's investigation for failing to contact Shirley Birchett, who has filed a declaration stating that she and her son Michael saw Brown in his Corvette a half mile away from Bosn's Locker on the night of the shooting and that when they later arrived at 59th and Shattuck they saw Brown standing there with Angie Brown. Pet. Ex. U (M. Birchett Decl.) ¶¶ 2–4; Pet. Ex. V (S. Birchett Decl.) ¶¶ 2–6. According to a declaration filed by petitioner's habeas investigator, Michael Birchett showed the investigator the route that he and his mother drove that night before again encountering Brown, which took approximately two to three minutes to drive. Pet. Ex. W (Koehler Decl.) ¶ 17. Brown further argues that West could have called Angie Brown again at the second trial, and countered the fact that she had misidentified the race of the disk jockey at Bosn's Locker by pointing out that Evaneski had light brown skin and that another witness had misidentified Evaneski as black. Ex. B at 2082.

■■ However, as long as counsel's decision is reasonable, the decision whether to present a particular defense or to call a particular witness at trial generally falls within the realm of tactical choices to which courts should defer. *See United States v. Chambers,* 918 F.2d 1455, 1461 (9th Cir.1990); *Morris v. State of Calif.,* 966 F.2d 448, 456–57 (9th Cir.1991). Here, the witness testimony that would have established Brown's presence in the area

shortly after the shooting would not have proven that he was not the shooter, and could have been viewed by jurors as incriminating rather than exculpatory.[10] West's decision to focus on the misidentification defense and to forego these witnesses was therefore reasonable.

### 3. Failure to present evidence to impeach Williams' testimony (Claim 3)

Williams was a crucial prosecution witness. Brown argues that defense counsel made insufficient efforts to impeach Williams' testimony, and suggests that defense counsel might have been influenced by an erroneous belief that Williams' testimony "helped us more than hurt." Pet. Ex. M (Young Decl.) ¶ 10 (quoting West); Pet. Ex W (Koehler Decl.) (quoting West).

#### a. Corroboration of Baxter's testimony

As discussed, during his testimony at Brown's trial, Baxter denied having been present at 59th and Whitney or having seen Brown on the night of the shooting. The district attorney impeached Baxter with questions about his involvement in dealing drugs for Brown, and did not ask Baxter where he was at the time of the shooting or immediately prior. When asked whether she had any questions for Baxter, defense counsel responded, "[a]bsolutely none," a fact which the district attorney emphasized in closing argument:

> Absolutely none. No questions of a man who comes in and says her client is his boss, and he sells crack cocaine for him, and the defendant made about three to four thousand dollars for a three month period of time—
>
> [interrupted by objection and admonition]
>
> This is what I'm saying. This is the reason why he is lying for Paul Brown because he deals drugs for him. That's precisely the point. But Ms. West has no questions for him, one of the critical witnesses in this whole case, and "I have no questions." She didn't try to make him out to be a liar, didn't try to undermine his credibility, didn't try to impeach him. Nothing. Does this shed some light as to why Mr. Brown was so interested in some dude in the Bosn's Locker that night? Who was the intended victim? And we're going to get to that later. But now you know the reason why Mr. Baxter lied about the meeting. He's covering for his drug-dealing boss. I wonder if they both paid taxes on that money they made. Think about that.

Ex. B at 2398–99. Brown contends that defense counsel was ineffective for failing to investigate evidence that would have corroborated Baxter's version of events and thereby undermined Williams' critical testimony. Brown further argues that such evidence would have undermined the justification for allowing Baxter to be questioned about his drug business relationship with Brown. Defense counsel does not now remember what her trial strategy was in connection with Baxter. Pet. Ex. J (West Decl.) ¶ 28.

Defense investigator Hicks met with Baxter in 1992 and 1993 but did not make

---

10. Petitioner asserts that the declarations of Michael and Shirley Birchett place petitioner away from the scene at the time of the shooting. *See* Petitioner's Brief in Support of Motion for Evidentiary Hearing at 5. However, review of the Birchett declarations and the declaration of habeas investigator M. Francie Koehler, does not support that contention.

*See* Pet. Ex. U–W. For example, the Koehler declaration indicates that the Birchett saw Brown in his *Corvette* one-half mile from Bosn's Locker or the night of the shooting, but does not demonstrate that this sighting occurred before the shooting. *See* Pet. Ex. W at 5.

any report of his interview; he recalls that Baxter stated that he was not present near Bosn's Locker on the evening of the shooting as claimed by Williams, but that he did not want to get involved in the case. Ex. O (Hicks Decl.) ¶ 12. Hicks billing records do reflect five contacts or attempts to contact Baxter and one attempt to locate "C. Haines," all of which took place prior to or during the first trial. Pet. Ex. M (Young Decl.) ¶ 11; Pet. Ex. O (Hicks Decl.) ¶ 13. Cheryl Haines, Baxter's girlfriend, had contacted Sergeant Thiem when Baxter was arrested in connection with the Bosn's Locker shooting to confirm that she was with Baxter at 744 56th Street on the night of the shooting; this call was recorded in Sergeant Thiem's log. Pet. Ex. CC (Police log) ¶ 17.

In 1998, an investigator for federal habeas counsel contacted Baxter, who stated that he had been with Haines, Joey Thomas and others on the night of the shooting; that he had been working on Haines' car all day in her driveway at 744 56th Street with Thomas and a mechanic named Red; and that when he was walking on 56th Street to return some tools he was told about the shooting by Rachelle Spencer. Pet. Ex. BB (Baxter Decl.) ¶¶ 1–4. When the investigator and Baxter located Joey Thomas, he gave the same version of events. Pet. Ex. W (Koehler Decl.) ¶ 10. A week later they located Rachelle Spencer, who signed a declaration confirming that she had seen Baxter on 56th Street shortly after the shooting. Pet. Ex. W (Koehler Decl.) ¶ 11; Pet. Ex. DD (Spencer Decl.) ¶¶ 1–3.

■ It is uncontroverted that the defense investigator made multiple attempts to contact Baxter, and that he stated that he did not want to be involved. Furthermore, there is no evidence that Baxter told defense counsel or her investigator about Spencer or Thomas, or identified how the defense team could have discovered these witnesses. There is no declaration from Haines in the record and so it is not possible to ascertain whether she would have testified to the version of events that she reported to the police. Similarly, there is no declaration in the record by Thomas, and Spencer's does not state whether she would have been willing to testify. Because there is evidence in the record that the defense investigator did attempt to contact Haines, and no indication that he was told of Thomas' or Spencer's identity or possession of relevant information, this Court concludes that the defense investigation of Baxter's whereabouts at the time of the shooting was reasonable. Furthermore, defense counsel's decision not to ask Baxter any questions at trial was a reasonable one, because despite the defense investigator's attempt to interview him, she did not know what Baxter would say and he had stated his desire not to be involved.

#### b. Presentation of Wadsworth's testimony

At the first trial, the defense called Linda Wadsworth to impeach Williams' testimony that Williams had been talking to Linda Wadsworth on Faye Jamerson's porch the night of the shooting. Wadsworth testified that she had been at home asleep until after the shooting at Bosn's Locker. Ex. A at 4381–85. However, on cross-examination Williams had referred to the person that she was with as Linda Walker, not Wadsworth, and so the district attorney argued in closing that Linda Wadsworth was the wrong Linda and that her testimony was therefore irrelevant. Ex. A at 3518, 4796–98. Defense counsel did not present any evidence explaining this discrepancy, but in closing she argued, "There is no Linda Walker. Linda Walker is Linda Wadsworth." Ex. A at 4853–54.

Wadsworth was not called as a witness at the second trial. West's declaration states that she does not remember why Wadsworth was not called. Pet. Ex. J (West Decl.) ¶ 27. Wadsworth has filed a declaration stating that she was available and willing to testify. Pet. Ex. Z (Wadsworth Decl.) ¶ 10. Brown points out that defense counsel could easily have clarified the discrepancy in names. In Sergeant Thiem's notes of his interview with Williams, Linda "Wallsworth," with an address of 5918 Whitney (Linda Wadsworth's address), is listed as one of the three women that Williams was with on the night of the shooting. Pet. Ex. Y (Thiem Notes). Defense counsel's reference to the misspelling of Wadsworth's name as "Wallsworth" suggests that she had a copy of these notes. Ex. A at 4381.

The government responds that the decision whether to call a particular witness is an unreviewable tactical decision, and that West could have believed that Wadsworth's testimony would merely have been cumulative, given that she had called Jamerson and Whitehead to testify. Furthermore, the government argues that Wadsworth's testimony would have put Brown in the area a the time of the shooting, which the defense had decided to avoid.

▉ As discussed above, Williams' testimony, placing Brown near the scene of the crime before and after the shooting, was central to the prosecution's case. Moreover, the credibility of each of the other witnesses who attempted to impeach Williams' testimony, Baxter, Jamerson and Whitehead, had been seriously undermined. Thus, Wadsworth's testimony might have been particularly useful to impeace Williams' testimony. The question of whether the failure to present Wadsworth as a witness was or was not a reasonable tactical decision is close. However, even assuming that the failure to call Wadsworth was not a reasonable tactical deci-

sion, the Court concludes that Brown has not demonstrated reasonable probability that the result would have been different if Wadsworth had testified Wadsworth's testimony might have successfully impeached Williams' testimony that she was on Faye Jamerson's porch with Wadsworth at some point before the shooting. However, in light of the other evidence presented at trial, including the eye witness testimony and the physical evidence discovered by the police, the Court cannot say that there is a reasonable probability that but for counsel's failure to present Wadsworth, the result would have been different.

### 4. Inadequate preparation and presentation of witness testimony

Brown contends that defense counsel inadequately prepared Jamerson and Whitehead as witnesses, resulting in major problems in the presentation of their testimony. As discussed earlier. Jamerson's testimony that she was in Arkansas on the night of the shooting was impeached by the admission of the funeral memorial program, which showed that the service had been held in Texas. Once the court discovered the discrepancy, investigator Olivier contacted Jamerson, who explained that she had traveled to Texas for the funeral and then accompanied her family to Arkansas, where she stayed until March. Pet. Ex. L (Olivier Decl.) ¶ 11; Pet. Ex. EE (Jamerson Decl.) ¶¶ 1–5. Counsel wanted to recall Jamerson to offer this explanation, but Jamerson stated that she was unable to come to court because of a medical condition. Jamerson did not expect the condition to keep her debilitated for long, and was willing to attend court on another day, but Olivier did not ask her about this possibility. Pet. Ex. L (Olivier Decl.) ¶ 12; Pet. Ex. EE (Jamerson Decl.) ¶¶ 10–13. Defense counsel gives the following explanation for de-

ciding not to request a continuance in order to recall Jamerson:

> [F]irst, as I recall, the jury was returning to court that morning in expectation of hearing final argument. It was felt that the jury might become angry or at least annoyed with the defense for delaying the trial for a witness whose testimony would last at most perhaps a few minutes. Second, we felt it was tactically inadvisable to conclude the trial on a weak note, that is sounding defensive. We believed that the explanation of the conflict could be addressed in argument.

Pet. Ex. J (West Decl.) ¶ 19.

In his closing argument, the district attorney emphasized the discrepancy in Jamerson's testimony as illustrating the fear that people in the neighborhood felt about testifying against Brown:

> Ladies and Gentlemen, Celebrating the Treasured Memories, Foster Whittaker, The Berean Missionary Baptist Church, 11114 Cullen Boulevard, Houston, Texas, 77047 I guess the defense ought to take a remedial brush-up on geography. Now, we prove the funeral was in Texas. I wouldn't want to walk from Houston to Arkansas. It would take a month to do it. She says a story she was out of town. Why? Because she wants nothing to do with testifying against Paul Brown.
>
> Fear, ladies and gentleman. Fear is what it is.

Ex. B at 2390–91. *See also* Ex. BR at 2390–91, 2406–07, 2416–17 (referencing this discrepancy). Defense counsel's rebuttal suggested possible explanations for the inconsistency:

> Nothing in this transcript says that she did not go to Texas to the funeral and then on to Arkansas, where she's from, to stay with her family or whatever.... She knew she was on a trip that month. She was never permitted to explain her exact itinerary. I don't even care. Maybe she didn't even remember that the first day was in Texas for the funeral. Maybe she doesn't even remember. Maybe if she had been permitted to describe the document, she would have explained. But it is absolutely preposterous that she is coming in here because she is afraid and is testifying that she was out of state so that she doesn't have to testify that she was in the state, standing on her lawn in the rain, talking to this lunatic woman, with people—with Paul Brown and Michael Baxter going up and down the street.

Ex. B at 2463–64.

Whitehead had testified that she did not see Williams on the night of the shooting. Ex. B at 2237–38. She testified that at approximately 6:00 or 7:00 p.m. she drove to the Greyhound bus station to pick up her grandchildren, who had been on a school outing, at her daughter's request. Ex. B at 2236–42. She then went to Safeway to pick up a cake for her wedding anniversary and by the time she returned home the street was blocked off with emergency vehicles, forcing her to take a different route. Ex. B at 2237–38. During cross-examination, Whitehead became flustered, gave a confusing account of whether other children were on the bus with her grandchildren, and was unable to think of her grandson's name. Ex. B at 2243–44. Defense counsel did not ask any questions on redirect or call any witnesses to corroborate Whitehead's testimony. In his closing, the district attorney questioned the credibility of Whitehead's account that her younger grandson had gone on a school outing with her older granddaughter, that they both missed the bus, and that a bus full of other children who also must have missed the bus arrived at the bus station but no other adults were there to pick them up. He stated, "we have a woman picking up imaginary kids, she doesn't know the name of her own grand-

son, at a Greyhound bus depot," and argued that this was "[p]ure and simple testimony of one who certainly doesn't want to be involved with the defendant Paul Brown." Ex. B at 2383–89, 2404–07. In an interview with present habeas counsel and investigator, West stated that she did not call any family members to corroborate this testimony because they "would have made it worse." Pet. Ex. W (Koehler Decl.) ¶ 6.

Brown faults defense counsel for failing to adequately prepare Jamerson for her testimony, so that the discrepancy could have been explained while she was on the stand, and for failing to examine the funeral program before offering it into evidence. Defense counsel's declaration states that her investigator examined the program, and that she was unaware that the location printed on the program was inconsistent with Jamerson's testimony until the Court informed her of this fact; she further claims to have spoken with every defense witness prior to his or her testimony. Pet. Ex. J (West Decl.), ¶¶ 17, 24. Both the defense investigator and Jamerson have filed declarations stating that defense counsel did not speak with Jamerson before her testimony at the second trial.[11] Pet. Ex. EE (Jamerson Decl.), ¶ 8; Pet. Ex. L (Olivier Decl.), ¶¶ 8–9. Brown also argues that counsel inadequately prepared Whitehead and failed to rehabilitate her testimony. Finally, he points out that if Wadsworth had been called as a witness she could have corroborated Whitehead's testimony not only by denying having had a conversation with Williams that evening but also by stating that Whitehead called her to tell her that something was going on up at the corner and that they met on the corner of 59th and Whitney.

 The government argues that because Jamerson had testified without impeachment at the first trial defense counsel had no reason to be concerned about discrepancies in her testimony or to realize that she should closely examine the funeral program. Furthermore, the government points out that defense counsel attempted to cure the error by recalling Jamerson, but her illness and defense counsel's desire to avoid annoying the jury prevented her from doing so. Although the decision not to delay the trial in order to recall Jamerson was a reasonable one that was based on strategic considerations, the damage done to the defense by the discrepancy between Jamerson's testimony and the funeral program was significant, and the prosecutor relied on this discrepancy as strong evidence for his contention that defense witnesses were fabricating their testimony because of their fear of the defendant. Whether the fault rests with the defense investigator or with defense counsel, the failure to examine the funeral program before offering into evidence fell below an objective standard of reasonableness. The Court cannot reach the same conclusion regarding Whitehead's testimony. It is not necessarily within defense counsel's control to prevent a witness from falling apart on cross-examination or to predict that she will do so and therefore refrain from calling her, and there is no evidence that counsel's performance was deficient other than the fact that Whitehead performed poorly on cross-examination. However, viewing the failure to examine the funeral program before offering it into evidence in light of the other evidence presented at trial, including the eye witness testimony and the physical evidence discovered by the police and defense

---

11. The investigator's declaration states that defense counsel asked him to make sure that witnesses arrived early on the day of their testimony so that she could speak with them, but that on more than one occasion defense counsel was late and therefore did not speak to the witness before he or she testified. Pet. Ex. L (Olivier Decl.) ¶¶ 6–7.

counsel's efforts to explain the discrepancy between Jamerson's testimony and the funeral program, the Court cannot say that there is a reasonable probability that but for counsel's failure to examine the funeral program the result would have been different.

### 5. Inadequate impeachment of eyewitness testimony

At both trials, defense counsel's theory was that Brown had been misidentified by witnesses in the bar. At the first trial, counsel called Dr. Lee Coleman as an expert witness to testify about the effect of dreams on memory. His testimony was undermined by the district attorney's cross-examination. Defense counsel did not call Coleman or any other expert on eyewitness testimony at the second trial. She has explained that "[t]his was a tactical decision agreed upon by Mr. Braverman and me," that she has found that juries are not favorably disposed toward expert testimony about common sense issues such as eyewitness identification, and that the prosecution often calls a counter-expert. Pet. Ex. J (West Decl.), ¶¶ 22; Pet. Ex. M (Young Decl.), ¶ 8. Furthermore, after the first trial, the jurors had told West "that they rejected Dr. Coleman's testimony." Pet. Ex. J (West Decl.), ¶ 22.

Brown has submitted a declaration by Robert Shomer, an expert in the field of eyewitness testimony, which discusses at length the various problems with the witnesses' identification of Brown and advances the "strong opinion" that an expert in eyewitness identification should have been used and characterizing the identifications of Brown as "two very unusual and somewhat bizarre identifications." Ex. FF (Shomer Decl.), at 3. Brown also generally complains that defense counsel inadequately impeached these witnesses' testimony, and urges the Court to compare her cross-examination of these witnesses with the factors identified by Shomer.

However, as the government points out, West's decision not to call an expert in the field of eyewitness identification was a tactical one that fell within the range of reasonable choices. *See United States v. Labansat,* 94 F.3d 527, 530 (9th Cir.1996) (reasonable counsel would not necessarily have hired eyewitness identification expert); *United States v. Brewer,* 783 F.2d 841, 843 (9th Cir.1986) (no prejudice resulted from failure to appoint eyewitness expert because cross-examination is usually effective to expose weaknesses in identification). Furthermore, counsel cross-examined the witnesses about prior inconsistencies and emphasized each of the specific problems with their identification of Brown in her closing argument,[12] rendering her performance adequate under the Sixth Amendment.[13]

---

12. During cross-examination, counsel elicited Tomlin's admission that she had seen the shooter for a few seconds at most and that at the June 1992 preliminary hearing she had told the lawyers that she could not identify the shooter. Ex. B at 1961, 1975. Counsel also questioned Tomlin about the inconsistencies between the description of the shooter that she had given at the hospital shortly after the shooting and later descriptions, and about her telling the police that she would not sign Brown's photograph because she was not sure that he was the shooter. Ex. B at 1966-

67, 1972–73. During Wallace's cross-examination, counsel asked him about having identified someone other than Brown as the shooter at a previous hearing and emphasized that, although Wallace had focused on the shooter's eyes as the basis for his identification, he could not now remember the color of the shooter's eyes. Ex. B at 2026–35.

13. Brown's final IAC contention, that counsel was constitutionally deficient for failing to move to strike Officer Blackwell's testimony about Mark Norman's drug dealing, is discussed below is connection with Brown's ar-

## B. Evidentiary Errors

The prosecution's theory of motive was that Brown had committed the shooting as retaliation for an earlier shooting at the house of Barber's grandfather, where Barber lived. The theory was that the shooting at Barber's grandfather's had been carried out by a drug gang, of which Mark Norman was a primary customer, that was engaged in a turf battle with Brown and Barber's drug gang. Mark's brother, Patrick, was inside Bosn's Locker at the time of the shooting and was injured by gunshots, and the prosecution believed that he was the "dude sitting in the bar" to which Barber had referred. At the first trial, the prosecution sought to introduce evidence to support this theory. Pet. Ex. A at 9. However, the trial court ruled that this evidence was inadmissible because there was no foundation for the speculative theory of retaliation. Ex. A 1109; Ex. B at 1607–08. The trial court adhered to this ruling in the second trial despite two motions to reconsider. Ex. B 1608, 1614–15. Brown contends that despite this ruling the prosecution introduced and commented on evidence of Brown's involvement in drug dealing.

■■■■■■ A person in custody pursuant to the judgment of a state court can obtain a federal writ of habeas corpus only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a). The admission of evidence is therefore not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process. *See Henry v. Kernan,* 197 F.3d 1021, 1031 (9th Cir.1999); *Colley v. Sumner,* 784 F.2d 984, 990 (9th Cir.1986). The due process inquiry in federal habeas review is whether the

admission of evidence was arbitrary or·so prejudicial that it rendered the trial fundamentally unfair. *See Walters v. Maass,* 45 F.3d 1355, 1357 (9th Cir.1995). Only if there are no permissible inferences that the jury may draw from the evidence, can its admission violate due process. *See Jammal,* 926 F.2d at 920. Juries are presumed to follow a court's limiting instructions with respect to the purposes for which evidence is admitted. *See Aguilar v. Alexander,* 125 F.3d 815, 820 (9th Cir. 1997). Extreme situations may arise, however, that defeat this presumption, when the instructions given will not be sufficient to overcome the prejudice from improperly admitted evidence. *See id.*

### 1. Impeachment of Michael Baxter with drug gang evidence

The court allowed Michael Baxter to testify over defense objections. During his testimony. Baxter testified that he had not had the conversation with Brown that Williams claimed to have witnessed. The prosecutor then asked Baxter whether he had dealt drugs for Brown, to which Baxter responded affirmatively. Ex. B at 1916. After the defense objected, the court gave an instruction that the evidence of drug dealing was to be considered only for its relevance to Baxter's credibility. *Id.* Over defense objections, the prosecution elicited Baxter's admissions that he had earned a few hundred dollars for himself and thousands of dollars for Brown over a three month period of dealing cocaine for Brown. Ex. B at 1916–18. The court gave another limiting instruction. *Id.* at 1919.

The prosecution exploited this evidence in his closing argument, referring to Baxter as "[t]his crack cocaine dealer for Paul Brown." Ex. B at 2378. The prosecution argued that Baxter lied in his testimony

gument that the trial court erred by admitting

this testimony and later refusing to strike it.

because "[h]e works for the defendant, pure and simple ... Brown is the boss, crack dealer of Mr. Baxter." Ex. B 2479. The prosecution also argued that Brown had considered the murder charges against him "no big deal" because he was "Mr. Big Drug Dealer on the streets" and therefore was not afraid of anybody or anything. *Id.* at 2380.

Brown argues that the prosecution called Baxter to testify, despite its knowledge that his testimony would not support the prosecution, in order to offer otherwise inadmissible impeachment evidence. Brown argues that the trial court erred in allowing the prosecution to call Baxter as a witness, over defense objections, and then allowing him to be impeached with evidence of his involvement with Brown in drug dealing. He points to a decision by the Ninth Circuit, which interpreted federal evidence law to establish a rule that, although a party may impeach its own witness, "the government must not knowingly elicit testimony from a witness in order to impeach him with otherwise inadmissible testimony." *United States v. Gomez–Gallardo*, 915 F.2d 553, 555 (9th Cir. 1990). In evaluating the reason why a witness was called, the reviewing court must "determine whether the government examined the witness for the *primary* purpose of placing before the jury substantive evidence which is not otherwise admissible." *Id.* (emphasis in original).[14]

The California Court of Appeal concluded that the prosecution had a legitimate purpose in calling Baxter: "namely, to prevent the jury from speculating why the prosecution did not call Baxter when he was obviously such an important figure in Gwendolyn Williams's testimony." Pet. Ex. A at 14–15. It therefore found that the primary purpose of calling him was not to impeach his testimony and introduce

otherwise inadmissible evidence. As the government points out, decisions like *Gomez–Gallardo* interpreting error under the Federal Rules of Evidence on direct review do not necessarily establish constitutional rules that must be followed in state court proceedings. Accordingly, "habeas relief is available for wrongly admitted evidence only when the questioned evidence renders the trial so fundamentally unfair as to violate federal due process." *See Jeffries v. Blodgett*, 5 F.3d 1180, 1192 (9th Cir.1993), *cert. denied*, 510 U.S. 1191, 114 S.Ct. 1294, 127 L.Ed.2d 647 (1994).

■ Moreover, "where evidence introduced by the prosecution [raises] more than one inference, some permissible, some not, we must rely on the jury to sort them out in light of the court's instructions. Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must be of such quality as necessarily prevents a fair trial." *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir.1991) (quotation omitted). Here the Court of Appeal found that the evidence was admissible, and primarily admitted, for the purpose of impeaching Baxter who was according to Williams, a crucial alleged witness. The trial court also repeatedly instructed the jury that the evidence about Baxter and Brown's drug dealings could be used only to evaluate Baxter's credibility. In these circumstances, the Court cannot say admission of the evidence rendered the trial so fundamentally unfair as to violate federal due process.

**2. Officer Blackwell's testimony about Mark Norman's drug involvement**

On redirect, the prosecution elicited from Officer Charles Blackwell, who had

---

14. Brown also argues that the prosecutor exploited the drug evidence for impermissible purposes in his closing argument. This allegation will be addressed below.

been present at the bar prior to the shooting, that he knew of Mark Norman's involvement in drug dealing in the neighborhood. Ex. B at 1833. Defense counsel sought permission to approach the bench and, outside the presence of the jury, objected to that line of questioning. Her objection was essentially sustained by the Court, but defense counsel did not make a motion to strike the inadmissible testimony at the time. Ex. B at 1837. After the defense rested, the prosecution revisited the issue of Officer Blackwell's testimony and pointed out that his answer had been recorded and not stricken. Defense counsel informed the court that she had not heard the answer, and the court stated that it would consider striking the answer in the event that the jury requested that the testimony be read back. Ex. B at 2367–68; Pet Ex. A at 16–17. The court also reminded the prosecutor that he was precluded from arguing that Mark Norman was a drug dealer or that Brown was a drug dealer, except for the limited purpose related to Baxter's impeachment. Ex. B at 2368–69. When the jury did request such a read back, defense counsel made a motion to strike, which the trial court denied. Ex. B at 2533–34.[15]

During closing argument, the prosecutor relied on this evidence to argue that Patrick Norman Mark Norman's brother, was the "dude" in the bar to which Baxter had referred. Ex. B at 2415. He also noted that the shooting took place approximately ten to fifteen minutes after Patrick Norman entered the bar. The California Court of Appeal acknowledged that the trial court's reasons for refusing to strike the testimony and allowing it to be read to the jury were not clear, but reasoned that the decision was not in error because the motion to strike was untimely. Pet. Ex. A, 17–18. It characterized defense counsel's delay in moving to strike the testimony in question as a waiver of Brown's rights, and reasoned that the trial court had no sua sponte obligation to strike the testimony at the time of the original objection to the question. Pet. Ex. A at 17–19. While the Court of Appeal found that the prosecution's suggestion that the presence of Mark Norman's brother in the bar provided the motive for the shootings "overstepped the bounds of permissible argument," Pet. Ex. A at 19, the court concluded that this error was harmless because the trial court instructed the jury that evidence of Baxter's drug dealing was relevant only to his credibility and because of the strength of the prosecution case.

■ The Court agrees. The link between the evidence of Mark Norman's drug use, the prosecutor's argument that Mark Norman's brother was the intended victim of the shooting, and Baxter's testimony that he sold drugs for Brown, can only be made as a result of numerous and unargued inferences. Moreover, the trial court repeatedly instructed the jury that the evidence of drug dealing could only be used to evaluate Baxter's credibility. In these circumstances, the Court cannot say admission of the evidence of Mark Norman's drug use rendered the trial so fundamentally unfair as to violate federal due process.

---

**15.** Brown argues that defense counsel was ineffective for failing to move to strike the answer referring to Mark Norman's drug dealing, after the trial court sustained her objection to the prosecutor's question. Ex. B at 1833–37. Brown argues that although defense counsel did not hear the answer and thus was unaware an answer had been given, defense counsel was ineffective because she could have reviewed the daily transcript and noticed Officer Blackwell's answer, which would have enabled he to make a timely motion to strike. However, this does not amount to error under *Strickland.*

### 3. Brown's statement to police

Defense counsel objected to the admission of Brown's statement that his arrest "was no big deal" on the grounds that it was irrelevant and prejudicial. Ex. A 4144–45.[16] The trial court ruled that it was admissible on the ground that it was "in the category of booking type information." Ex. A at 4178–79. Brown now argues that the trial court failed to weigh the prejudicial effect of the statement against its probative value, and points out that the prosecution used this evidence in its closing to urge the jury to make impermissible inferences:

No big deal. No big deal. You're under arrest for one of the worst shootings in the history of Oakland and it's no big deal.

Well, maybe Mr. Big Drug Dealer on the streets fears nobody and nothing. Maybe that's why it's no big deal.

Ex. B at 2379–81.

▬ The California Court of Appeal reasoned that Brown's statement was somewhat probative as consciousness of guilt. Pet. Ex. A at 35. Additionally, the court noted that as Brown had been aware of his right to remain silent but chose to make the statement at issue, this statement was admissible as evidence of consciousness of guilt. Pet. Ex. A at 36. Therefore, the Court of Appeal found that whether the statement actually evidenced consciousness of guilt was a question for the jury but that it was clearly admissible. *Id.* Finally, the Court noted that the trial court implicitly weighed the prejudice against the probative value of the statement. Pet. Ex. A at 37. The Court of Appeal's decision is neither contrary to nor an unreasonable application of federal law. The information was relevant for a permissible purpose and its admission by the trial

court was not arbitrary or so prejudicial that it rendered the trial fundamentally unfair.

### 4. Reference to Brown's prior criminal history

The picture of Brown that had been used in the photographic lineup that was shown to witnesses, Tomlin and Wallace was a mug shot from a 1988 arrest for auto theft. Ex. B at 2339. During Sergeant Thiem's direct testimony, the prosecutor asked him to explain how a photographic lineup is assembled. Ex. B at 2055. Defense counsel requested a bench conference and expressed concern that the answer to this question would reveal Brown's prior arrest. Ex. B at 2056. The trial court offered to confer with Thiem in chambers but the prosecution offered to "lead Thiem through it." *Id.* The prosecution elicited testimony that the photographic lineup had been assembled with the photograph of a suspect are "fillers," people who were not allegedly involved in the crime. On cross-examination, however, the following questioning ensued:

Q. Did you leave the photos in that file folder?

A. No. After the case was concluded, as I always do, I remove the photos from then I have them numbered and I put them in an envelope, turn them into evidence, and believe at one of the preliminary hearings I was requested to bring the actual envelop to turn in as a court exhibit.

Q. Did you leave them in the envelope when you showed them to Ms. Tomlin?

A. Oh, yes. We have to do that because these are mug shots, and on the bottom of the photos there is names and stuff like that that we have to cover up.

---

**16.** Petitioner asserts that this issue was first raised in an *in limine* motion made at the first trial, which was deemed to have been made at the second trial. Ex. B 7–8.

Q. On the fillers and so forth?

A. Yes, on all of them.

Ex. B at 2064.

During the cross-examination of Sergeant Emery, the prosecutor asked how a photographic lineup is put together, phrasing his question, "So you gather a bunch of mug shots and cover up the identifying information, would that be fair to say?" Ex. B at 2279. The trial court sustained petitioner's objection to this question. Shortly thereafter, the prosecution asked why Brown's photograph had been included in the photographic lineup. Defense counsel objected and, during a bench conference, the trial court ruled that the prosecutor could not elicit testimony that rumors had been heard that Brown was involved in the shooting, and further cautioned the prosecutor that the photographs were not to be identified as mug shots. Ex. B at 2281. However, later in the cross-examination, over a defense objection, the court permitted the prosecutor to ask Emery where photographs like Brown's were kept; Emery responded that they were in the identification section of the police department, "where we keep photographs of people that have been arrested in the past." Ex. B at 2282–83. Defense counsel then made a motion for a mistrial on the grounds that the prosecutor was clearly trying to suggest that Brown had been arrested before. Ex. B at 2286. The trial court denied the motion and an appropriate limiting instruction was discussed. *Id.* at 2286–87. The court finally decided to inform the jury, based upon a stipulation offered by defense counsel, that the photograph had been taken in 1988 in connection with an arrest for auto theft and that the photograph did not reflect on the final disposition of the case. Ex. B at 2339.

 Petitioner complains that the trial court erroneously allowed the prosecution to question Sergeant Emery about where photographs like the one of petitioner are kept.[17] However, the Court finds that the evidentiary ruling was not arbitrary or so prejudicial that it rendered the trial fundamentally unfair. The trial court had cautioned the prosecution not to refer to or elicit testimony referring to the fact that the photo was a mugshot or other testimony that would indicate that Brown had a criminal record. It was not obvious that testimony about Brown's prior arrest would result from a question of where the photo used in photo line-ups were kept. Moreover, the testimony did not result in prejudice such that the trial was fundamentally unfair. As the Court of Appeal found, the instruction given to the jury, based on the stipulation offered by defense counsel, minimized any potential prejudice stemming from the evidence of Brown's prior criminal history. Pet. Ex. A at 27.

## C. Prosecutorial Misconduct

 Prosecutorial misconduct is cognizable in federal habeas corpus. A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair." *See Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986); *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). Claims of prosecutorial misconduct are reviewed "on the merits, examining the entire proceedings to determine whether the prosecutor's remarks so infected the trial with unfairness as to make the resulting convictions a de-

---

**17.** Petitioner's allegation of judicial error on this topic is unclear. The Court assumes that petitioner is challenging the trial court's overruling defense counsel's objection to the question of where photographs like petitioner's are kept, because the Court otherwise sustained defense counsel's objections.

nial of due process." *Johnson v. Sublett,* 63 F.3d 926, 929 (9th Cir.1995) (internal quotation marked and citation omitted).

When the trial court gives a curative instruction, it is presumed that the jury has disregarded inadmissible evidence and that no due process violation occurred. *See Greer v. Miller,* 483 U.S. 756, 766 n. 8, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987); *Darden,* 477 U.S. at 182, 106 S.Ct. 2464. This presumption may be overcome if there is an "overwhelming probability" that the jury would be unable to disregard evidence and a strong likelihood that the effect of the misconduct would be "devastating" to the defendant. *See Greer,* 483 U.S. at 766 n. 8, 107 S.Ct. 3102. Other factors which a court may take into account in determining whether misconduct rises to a level of due process violation are: (1) the weight of evidence of guilt, *see United States v. Young,* 470 U.S. 1, 19, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985); *United States v. Schuler,* 813 F.2d 978, 982 (9th Cir.1987); (2) whether the misconduct was isolated or part of an ongoing pattern, *see Lincoln v. Sunn,* 807 F.2d 805, 809 (9th Cir.1987); (3) whether the misconduct relates to a critical part of the case, *see Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); and (4) whether a prosecutor's comment misstates or manipulates the evidence *see Darden,* 477 U.S. at 182, 106 S.Ct. 2464.

In considering whether improper questioning deprived the defendant of a fair trial, the witness testimony should be viewed as a whole to determine the impact of the improper questioning. *See Ortiz v. Stewart,* 149 F.3d 923, 934–35 (9th Cir. 1998) (prosecutor's questioning witness as to whether she was afraid of defendant did not render the proceedings fundamentally unfair in light of witness' other testimony that defendant murdered her mother, stabbed her sister, stabbed her, and then tried to burn down their house while the victims were still inside); *cf.* *United States v. Sanchez,* 176 F.3d 1214, 1220–21, 1222, 1223–24 (9th Cir.1999) (misconduct where prosecutor elicited defendant's testimony that U.S. Marshal was a liar, witness's opinion that defendant was a liar, other people's hearsay statements, and inadmissible evidence of prior bad acts).

The California Court of Appeal held that the prosecutor committed a number of acts of misconduct in his closing argument. First, the court held that the prosecutor engaged in misconduct by arguing that Brown was not afraid of the charges because he was "Mr. Big Deal Drug Dealer on the streets." Second, the court stated that the prosecutor committed a "more serious ... transgression" by reading Baxter's testimony to the jury and then asking, "Does this shed light as to why Mr. Brown was so interested in some dude in the Bosn's Locker that night? Who was the intended victim?"—which the court reasoned "unmistakably impl[ied] the killing was somehow drug related." The court held that the prosecutor had disregarded the court's directives in arguing these impermissible inferences. Pet. Ex. A at 21. However, the court reasoned that the prosecutor's "overreaching" did not require reversal because the prosecutor had implied that the killing was drug related but never expressly stated it, the trial court had given limiting instructions about the relevance of Baxter's testimony, and "the prosecution's case was hardly weak." Pet. Ex. A at 22–23. The third act of misconduct identified by the court involved the prosecutor's questioning of Sergeant Emery about how the police had obtained Brown's photograph, including asking a question that specifically referenced mug shots. Pet. Ex. A at 26–27. Again, however, the court found that the misconduct was not prejudicial, because the 1988 offense was unrelated to the offense with which he was currently charged and be-

cause the trial court instructed the jury that the picture demonstrated only that Brown had been arrested but not the disposition of the charge. Finally, the court considered the cumulative impact of the prosecutorial misconduct and held that it "did not rise to the level of federal constitutional error." Pet. Ex. A at 27–28; *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).

■ The Court finds the Court of Appeal decision that the prosecutorial misconduct did not rise to the level of constitutional error is neither contrary to nor an unreasonable application of the Supreme Court's *Darden* standard.[18] *See Furman v. Wood*, 190 F.3d 1002 (9th Cir.1999). For the reasons stated by the Court of Appeal, the prosecutor's remarks did not so infect the trial with unfairness or prejudice as to make the resulting conviction a denial of due process.

### D. Denial of Motion to Discharge Appointed Counsel (Claim 8)

After the guilty verdict and before the penalty phase, Brown filed a *Marsden* motion to relieve West as lead counsel and substitute Braverman, who was serving as associate counsel. Brown explained to the trial court that he was dissatisfied with West's efforts to contact McCarthy, who he alleged had exculpatory information, and stated that he was worried whether West would represent his best interests during the penalty phase. The trial court held a *Marsden* hearing, at which both Brown and West presented their points of view. In addition to complaining that West had not expended her best efforts to contact McCarthy, Brown claimed that she

had told him that she was being paid very little for representing him and was under stress due to her husband's death. Ex. B at 2567. West explained her efforts to contact McCarthy and her view that he was attempting to avoid any involvement. Ex. B at 2570–73. Brown responded that McCarthy had told Brown's mother that West had failed to show up at the arranged appointments. Ex. B at 2575–76. Brown further complained that West had terminated Hicks after the first trial and that Hicks was continuing to work to find McCarthy without pay because he believed Brown to be innocent. Ex. B at 2565, 2573. West responded that Hicks had resigned from the case because the court took too long to approve his payments and that he had submitted bills for all the work that he had done to contact McCarthy. Ex. B at 2574–75.

After hearing both parties' perspectives, the trial court concluded that it was "satisfied from the totality of this presentation and from [his] participation in both the first trial and this trial that Miss West properly represented Mr. Brown. There's no reason why she wouldn't be able to do so." Ex. B at 2576; Pet. Ex. A at 57. Because Braverman was already serving as associate counsel, the court considered appointing him lead counsel but decided against this course of action because Braverman would have required a two week continuance. Ex. B at 2576–78. After the penalty verdict but prior to sentencing, Brown again requested substitution of lead counsel, based on West's "failure to obtain information from a key eyewitness … that would have *Exonerated* me totally from this crime." Pet. Ex. A at 57; Ex. D

---

18. Counsel note that the Court of Appeal, in assessing each instance of prosecutorial misconduct applied the state law standard and not the federal standard for determining prejudice. However, under the federal standard for assessing the impact of prosecutorial mis-

conduct on a trial, for the reasons explained by the Court of Appeal, each instance of prosecutorial misconduct did not so infect the trial with unfairness or prejudice as to make the resulting conviction a denial of due process.

at 95 (emphasis in original). Brown's letter further stated that he found communication with West to be difficult because of the absence of trust between them. *Id.* In response, the trial court held a second *Marsden* hearing. When asked whether he had anything to add to the arguments that he had previously made, Brown indicated the grounds for his motion were detailed in the information already given to the Judge, but indicated that he and Ms. West didn't see eye-to-eye on certain things and specifically noted that King McCarthy was around but in hiding. Ex. B at 2807–08. West reiterated the explanation for her actions that she had given at the first *Marsden* hearing on the subject. Ex. B at 2808–09. The motion was denied and the trial court found that Ms. West had properly represented Brown. Ex. B at 2809–10.

■ To compel a criminal defendant to undergo a trial with the assistance of an attorney with whom he has become embroiled in irreconcilable conflict is to deprive the defendant of his Sixth Amendment right to counsel. *See United States v. Moore,* 159 F.3d 1154, 1158–59 (9th Cir. 1998).[19] When reviewing a state court's denial of a motion to substitute counsel, the habeas court considers whether the trial court's denial of the motion "actually violated [petitioner's] constitutional rights in that the conflict between [petitioner] and his attorney had become so great that it resulted in a total lack of communication or other significant impediment that resulted in turn in an attorney-client relationship that fell short of that required by the Sixth Amendment." *Schell v. Witek,*

218 F.3d 1017, 1026 (9th Cir.2000) (en banc).

■ The California Court of Appeal held that the trial court had fulfilled the requirements of state law by granting Brown the opportunity to explain why he wanted a new attorney and considering Brown's specific claims of ineffectiveness. The court determined that Brown had failed to demonstrate that West was inadequately representing him or that they had such an irreconcilable conflict that effective representation would be unlikely. Pet. Ex. A at 59. This Court agrees and finds the Court of Appeal's decision is neither contrary to nor an unreasonable application of clearly established federal law.[20] The trial court made a detailed inquiry into the nature of the conflict between defense counsel and Brown, and his finding that communication between defense counsel and Brown had not reached the level of an irreconcilable conflict is supported by the record. Brown's presentation of evidence of a conflict with his counsel does not constitute a showing of a total breakdown in communications, but at most a dispute over some tactical decisions made by Ms. West. *Schell,* 218 F.3d at 1026 & n. 8 (where conflict arose over decisions that are committed to the judgment of the attorney and not the client, such as tactical decisions on how to run a trial, the client received what the Sixth Amendment required in the case of an indigent defendant). The denial of his motion to substitute counsel therefore does not entitle Brown to habeas relief.

---

**19.** As noted above, *People v. Marsden,* 2 Cal.3d 118, 84 Cal.Rptr. 156, 465 P.2d 44 (Cal.1970), requires the trial court to permit a criminal defendant requesting substitution of counsel to specify the reasons for his request and generally to hold a hearing. This California rule substantially parallels the one prescribed by the Ninth Circuit in *Hudson v.*

Rushen. *See Chavez v. Pulley,* 623 F.Supp. 672, 687 n. 8 (E.D.Cal.1985).

**20.** The Court of Appeal's analysis is not inconsistent with the standard recently articulated in the Ninth Circuit for federal trials. *See U.S. v. Trung Tran Nguyen,* 262 F.3d 998 (9th Cir.2001).

### E. Right of Confrontation Violation in Relation to Vernon Wallace's Testimony (Claim 9)

At Brown's first trial, prosecution witness Wallace testified that from 1988 to 1990 he had worked as a security guard at Highland Hospital in Oakland, and that he left that job in order to begin another job in the construction industry. Ex. A at 3926–27. When asked whether he had been laid off or quit, he responded, "I quit them and started working somewhere else." *Id.* However, defense counsel had discovered evidence demonstrating that Wallace had been terminated from his job at Highland Hospital in 1987, after five months on the job, when his supervisor observed him kicking a patient and going through that patient's pockets. Ex. A at 4669–70. Therefore, after the defense had presented its case, defense counsel sought to introduce documentary evidence impeaching Wallace and to obtain a continuance in order to present a witness who could authenticate the relevant documents and/or the supervisor who had witnessed Wallace's acts and caused him to be terminated. Ex. A at 4670–72, 4677 4685–86. The trial court ruled that the documentary evidence was inadmissible hearsay and that any evidence on this subject was inadmissible because it would require a "mini-trial" on a collateral matter Ex. A at 4676–77, 4682, 4686–91. In response to the prosecution's objection, the court approved a stipulation to be read to the jury stating that Wallace had been terminated from his employment in 1987 Ex. A at 4691–93. During the second trial, defense counsel asked Wallace whether he had been terminated from his position as a security guard at Highland Hospital, and Wallace responded in the negative. Ex. B at 2037. When defense counsel then asked Wallace why he had stopped working there the prosecution objected and the court held an in chambers conference. *Id.* The court stated that the subject of Wallace's employment was a collateral issue. Ex. B at 2038. Defense counsel responded that Wallace's perjury at the first trial was relevant impeachment material because Wallace had lied under oath at the previous trial, demonstrating his lack of credibility. Ex. B at 2038–40. Defense counsel again offered to present proof of the statement's falsehood in the form of an eyewitness and documents Ex. B at 2039–41. The court reserved ruling, and defense counsel then sought to introduce proof that Wallace had lied in a job application. Ex. B at 2290–91. The court sustained the prosecution's objection, ruling that the subject was collateral, irrelevant, and that any limited probative value was outweighed by the waste of time and risk of "mini-trials" on such a collateral issue. Ex. B at 2292.

▮ Brown argues that the trial court's ruling deprived him of his right to confrontation under the Sixth Amendment's Confrontation Clause, which provides that in criminal cases the accused has the right to "be confronted with witnesses against him." U.S. Const. amend. VI. The rights protected under the Confrontation Clause include the right of cross-examination and the right to present relevant evidence. *See, e.g., Davis v. Alaska,* 415 U.S. 308, 315, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); *United States v. Medjuck,* 156 F.3d 916, 919 n. 1 (9th Cir.1998) (citation omitted). The Confrontation Clause does not prevent a trial judge from imposing reasonable limits on cross-examination based on concerns of harassment, prejudice, confusion of issues, witness safety or interrogation that is repetitive or only marginally relevant. *See Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). However, the trial court's discretion to limit the presentation of evidence "must yield to a defendant's constitutional right 'to present all

relevant evidence of significant probative value to the defense.'" *Franklin v. Duncan,* 884 F.Supp. 1435 (N.D.Cal.1995), *aff'd,* 70 F.3d 75 (9th Cir.1995).

■ To determine whether a criminal defendant's Sixth Amendment right of confrontation has been violated by the exclusion of evidence on cross-examination, a court must inquire whether: "(1) the evidence was relevant; (2) there were other legitimate interests outweighing the defendant's interests in presenting the evidence; and (3) the exclusion of evidence left the jury with sufficient information to assess the credibility of the witness." *See United States v. Beardslee,* 197 F.3d 378, 383 (9th Cir.1999) (citations omitted); *see, e.g., Evans v. Lewis,* 855 F.2d 631, 633–34 (9th Cir.1988) (no violation of Confrontation Clause where trial court restricted cross examination of prosecution witness whose bias and motivation had been clearly established and evidence sought to be introduced only cumulative on issue of credibility); *Pool v. Dowdle,* 834 F.2d 777, 780 (9th Cir.1987) (no violation to exclude expert testimony where testimony cumulative and not major part of defense; no violation to exclude evidence of reprimand in file of police officer witness).

■ The California Court of Appeal held that Brown's rights were not violated by this limitation upon cross-examination. The court noted that the Confrontation Clause does not preclude a judge from imposing limits upon a party's inquiry into the bias of an adverse witness, and that courts have broad discretion to decide whether to admit impeachment evidence. It reasoned that the evidence was of unproven and uncharged misconduct and that the concern that a "mini-trial" about Wallace's discharge would have resulted was legitimate. Pet. Ex. A at 29–31. The Court finds that the decision of the Court of Appeal is neither contrary to nor an

unreasonable application of clearly established federal law.

**F. Right to Impartial Jury**

**1. Remark by Courtroom Observer (Claim 10)**

After closing argument and before the instructions to the jury, the bailiff informed the trial court that an observer had entered the elevator and, in the presence of most of the jurors, commented, "You better not convict an innocent man. You better not convict an innocent man." Ex. B at 2491–92. Defense counsel expressed concern that the remark "sound[ed] threatening," especially in the context of the prosecutor's characterization of the defendant during his closing argument, and asked the court to question the jurors about what was said and the impact of the remark upon on the jury. Ex. B at 2493, 2495–96. The court rejected defense counsel's suggestion that the jurors be individually questioned, pointing out that by reporting the incident the jurors had followed their instructions and that there was no indication that any juror was intimidated or angry or would be biased because of the remark. Ex. B at 2494–95. Instead, the court admonished the jury:

You have two duties to perform. Your first duty is that you must determine the facts from the evidence received in the trial and not from any other source. Let me indicate, parenthetically, that I was informed by the bailiff that an incident occurred yesterday afternoon in an elevator in the presence of some members of the jury, a certain incident. It goes without saying that the incident is not evidence. And as to those of you who may have been present, you are instructed that you are not to consider that incident in any way in your determination as to the defendant's guilt or

innocence. Furthermore, those of you who may have been present are instructed not to discuss the matter with other members of the jury during your deliberations.

Ex. B at 2500.

Brown argues that the trial court erred in failing to hold a hearing or otherwise conduct an inquiry to determine the effect of the remarks upon the members of the jury, particularly given the prosecution's characterization of Brown as a dangerous individual who had intimidated witnesses in the case.

In *Remmer v. United States*, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954), the Supreme Court addressed the issue of unauthorized contact with jurors:

> In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.

*Id.* at 229–30, 74 S.Ct. 450 (remanding for a hearing in district court on prejudice). In *United States v. Angulo*, 4 F.3d 843 (9th Cir.1993), the Ninth Circuit reversed a conviction when one juror received a threatening phone call. Although that juror had been removed from the jury, the other jurors who were aware of the call were not, and no hearing had been held to determine the effect of the threat upon the other jurors; nor had the court given an admonishment to the jury or explained the threatened juror's absence. The *Angulo* court held that, "in determining whether a hearing must be held, the court must consider the content of the allegations, the seriousness of the alleged misconduct or bias, and the credibility of the source." *Id.* at 847.

■ The California Court of Appeal held that the incident was "spectator misconduct" rather than juror misconduct, and that prejudice was therefore not presumed under *People v. Hill*, 3 Cal.4th 959, 1002, 13 Cal.Rptr.2d 475, 839 P.2d 984 (1992). The court also distinguished *Remmer* and *Angulo*, on the grounds that in this case the trial judge had the bailiff testify before counsel and the defendant about what the juror told him about the incident, allowed counsel to argue whether an evidentiary hearing was required, and specifically instructed the jury to ignore the "spectator misconduct." The court also noted that under *Angulo*, an evidentiary hearing is not required for every allegation of juror misconduct or bias, and under the *Angulo* factors—viewing the content of the allegation, the seriousness of the alleged misconduct, and the credibility of the source—the trial judge's decision not to hold an evidentiary hearing was proper. Pet. Ex. A. at 40–50; *Angulo* 4 F.3d at 847. Finally, the court concluded that, under California law, it had to be presumed that the admonition to the jury cured the error, in the absence of any evidence to the contrary. This Court finds that the decision of the Court of Appeal was neither contrary to nor an unreasonable application of clearly established federal law. The trial judge explored the alleged misconduct, allowed counsel to address the alleged misconduct, and instructed the jury the day after the incident that they were not to discuss the incident in their deliberations and were not to consider the incident as evidence in determining Brown's guilt or innocence.

## 2. *Batson* Violation (Claim 11)

 Brown argues that his Sixth Amendment rights were violated by the use of peremptory challenges to remove African–American jurors. After the prosecutor exercised four peremptory challenges against prospective African–American jurors, just one African–American venireperson remained; the defense moved to discharge the panel on the ground that the prosecution was exercising racially discriminatory challenges. Ex. B at 1574, 1580–81. "The fact that a prosecutor's reasons may be 'founded on nothing more than a trial lawyer's instincts about a prospective juror' does not diminish the scope of acceptable invocation of peremptory challenges, so long as they are the actual reasons for the prosecutor's actions." *United States v. Power*, 881 F.2d 733, 740 (9th Cir.1989). *See also J.E.B. v. Alabama*, 511 U.S. 127, 148, 114 S.Ct. 1419, 1431, 128 L.Ed.2d 89 (1994) (O'Connor, J., concurring) (peremptory challenges are often based on "experienced hunches and educated guesses, derived from a juror's response at voir dire or a juror's 'bare looks and gestures'"). A prosecutor's articulated race-neutral (or gender-neutral) explanation for striking the jurors in question need not be persuasive, or even plausible: unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral. *See Purkett v. Elem*, 514 U.S. 765, 768–69, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (prosecutor's explanation that he struck African–American juror because he had long, unkempt hair, mustache and beard was race-neutral and satisfied second step); *United States v. Gillam*, 167 F.3d 1273, 1278 (9th Cir. 1998) (government's explanation that it struck Hispanic juror because he had been unemployed for a year and it was concerned about his ability to serve as a conscientious juror was race-neutral). The findings of the trial court on the issue of discriminatory intent are findings of fact entitled to the presumption of correctness in federal habeas review, and may be set aside, absent procedural error, only if they are not fairly supported by the record. *See Purkett v. Elem*, 514 U.S. 765, 769, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995); *see also Jones v. Gomez*, 66 F.3d 199, 201 (9th Cir.1995), cert. denied, 517 U.S. 1143, 116 S.Ct. 1437, 134 L.Ed.2d 559 (1996) ("[T]he ultimate determination of whether the prosecutor acted with discriminatory intent [ ] is a question of fact which turns primarily on an assessment of credibility.") (citation and internal quotation omitted).

### a. Bertram Jones

The trial court examined the jury questionnaires and indicated that a prima facie showing of bias, required under *People v. Wheeler*, 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748 (1978), may have been made regarding only Bertram Jones and invited the prosecution to comment. Ex. B at 1582, 1585. In response to the court's inquiry regarding its reasons for discharging Jones, the prosecutor explained that he was concerned about Jones' previous contact with law enforcement; his educated, arrogant status; his single marital status (and the effect it might have upon his consideration of victim impact evidence at the penalty phase); his uncomfortable body language; his liberal view of drug users; his four jobs in seventeen years with different companies; and his suspicion that Jones was dishonest in stating his views on the death penalty Ex. B at 1582–83. Defense counsel responded that Jones' contact with law enforcement had been a curfew violation in the late 1960s, that changing jobs four times in seventeen years meant nothing, that Jones had stated strong support for the death penalty, and that defense counsel did not see Mr. Jones as arrogant. Ex. B at 1584.

Based on these explanations, the trial court determined that the prosecutor's challenge to Mr. Jones was not based on any group bias and denied the *Wheeler* motion. Ex. B at 1586–87, 1591. Brown now argues that the prosecutor did not provide a race neutral explanations for this peremptory challenge. First, Brown argues that the record demonstrates that Jones had worked for four and one-half years in this then-current job as staff specialist with United Airlines, preceded by eight years with Chevron, U.S.A. in white collars jobs in two different locations, preceded by five years as a steelworker for U.S. Steel. (Juror Questionnaire, 2, 5). He argues, "[p]roper analysis of this pretextual reason reveals group bias in the labeling of a successful job history of a black man as indicative of arrogance." Pet. Memo. at 58. Further, Brown argues, the prosecution's claim that Jones had a liberal view of drug users is belied by Jones' questionnaire, which exhibits strong anti-drug statements. (Jones Questionnaire, 28–29). Finally, Brown argues, the record demonstrates that Jones was unequivocally in favor of the death penalty and there is no support for the prosecution's claim that Jones was deceptive on this subject. (Jones Questionnaire, 41, 43).

 The California Court of Appeal rejected Brown's argument. It reasoned that a prosecutor may excuse a juror for arbitrary or unsubstantiated reasons as long as the reasons given are not based upon presumed group bias, and held that at least two race neutral reasons supported the prosecutor's challenge: the perception that Jones was arrogant and was being dishonest in stating his views on the death penalty. *See United States v. Daly*, 974 F.2d 1215, 1219 (9th Cir.1992) (upholding strike of juror based on perception that had loner personality); *United States v. Changco*, 1 F.3d 837, 840 (9th Cir.1993) (upholding strike of juror that prosecutor believed was unable to relate to other jurors); *Burks v. Borg*, 27 F.3d 1424, 1429 (9th Cir.1994). Pet. Ex. A at 53. It further reasoned that the trial court, which is in the best position to judge the prosecutor's credibility, is entitled to substantial deference. The Court finds that the decision of the Court of Appeal was neither contrary to nor an unreasonable application of federal law. The findings of fact made by the trial court, and approved by the Court of Appeal, are supported by the record and deserve deference on federal habeas review.

### b. Wallace Jackson

Although the trial court decided that a prima facie case had not been made regarding the other three jurors, it solicited the prosecution's reasons for these challenges anyway. Ex. B at 1585. The prosecutor justified his challenge of Wallace Jackson based on the fact that "he had a brother convicted of a 211 but said that the brother was innocent. And I must have to ask this question in my own mind, what does he really feel about the system." Ex. B at 1589. The prosecutor further noted that in his questionnaire Jackson had stated that the death penalty saved money, but during voir dire stated that he did not really mean that, reflecting either dishonesty or smart-aleckness. Ex. B at 1589–90. The trial court denied the motion. Ex. B 1590.

 Brown counters that both Jackson's questionnaire and his answers during voir dire demonstrated strong support for the death penalty. Moreover, Brown argues, Jackson stated that the incident in which one of his brothers had been wrongfully punished did not bias him for or against the criminal justice system. The California Court of Appeal found that, assuming the prosecutor was required to justify Jackson's exclusion, the prosecutor

was not required to believe Jackson when he claimed not to have been biased by his experience. Pet. Ex. A at 54–55. This Court finds that the Court of Appeal's decision is neither contrary to nor an unreasonable application of clearly established federal law. The trial judge's acceptance of the prosecution's credibility determination as to Mr. Jackson is a determination that lies peculiarly within a trial judge's province. *See Burks v. Borg,* 27 F.3d 1424, 1429 (9th. Cir.1994). The findings of fact made by the trial court, and approved by the Court of Appeal, are supported by the record and deserve deference on federal habeas review.

## G. Cumulative Error (Claim 12)

 Brown argues that even if any single error carried insufficient prejudice to justify reversal of the guilty verdict, the cumulative impact of the errors in combination requires granting the writ. *See United States v. Castro,* 887 F.2d 988, 998 (9th Cir.1989); *United States v. Wallace,* 848 F.2d 1464, 1475 (9th Cir.1988). Brown asserts that because the cumulative impact of the judicial errors, combined with the prosecutorial misconduct, the improperly empaneled jury and the ineffective assistance of counsel, is so great and the case so close—as the first jury could not reach a verdict on the charges and the second jury deliberated for five days—that the errors deprived petitioner of his fundamental right to a fair trial. As discussed above, none of the errors cited by petitioner rises to the level of a constitutional violation and the Court rejects petitioner's argument that cumulatively, all of the claims asserted require granting the petition.

## H. Evidentiary Hearing

Along with his traverse to the government's answer, petitioner filed a motion requesting an evidentiary hearing on his claims of ineffective assistance of counsel and his claim asserting the trial court erred in denying Brown's *Marsden* motions. Section 2254(e)(2) of AEDPA provides that: "if the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—(A) the claim relies on—(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact finder would have found the applicant guilty of the underlying offense."

"Under the opening clause of § 2254(e)(2), a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *See Michael Wayne Williams v. Taylor,* ("*Williams II*"), 529 U.S. 420, 432, 120 S.Ct. 1479, 1488, 146 L.Ed.2d 435 (2000). "Diligence for purposes of the opening clause depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court." *Id.* at 435, 120 S.Ct. at 1490. "Diligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Id.* at 437, 120 S.Ct. at 1490.

With respect to Claim 1, asserting ineffective assistance of counsel based on failure to investigate and present evidence regarding witness King McCarthy and Claim 8, asserting that the trial court erred in denying petitioner's *Marsden* motions, the facts underlying these allega-

tions were addressed in the trial court *Marsden* hearings.[21] In those hearings, the trial court denied Brown's claims that his trial counsel should be removed for providing ineffective assistance. The trial court rejected these claims, stating, with respect to the first motion, that the court was "satisfied from the totality of [the] presentation and from [his] participation in both the first trial and this trial that Miss West properly represented" appellant. Pet. Ex. A at 57.

The Court of Appeal, in denying petitioner's *Marsden* claims, agreed with the trial court that trial counsel's representation was adequate under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Specifically, the Court of Appeal found that the state court "fulfilled its primary duty to listen to appellant, [and] the trial court did not abuse its discretion when it denied the *Marsden* motions." Pet. Ex. A at 59. The court found that Brown "failed to show Ms. West was providing inadequate representation or that he and Ms. West had become embroiled in such an irreconcilable conflict that ineffective representation was likely to result." *Id.* The Court of Appeal also specifically condoned Ms. West's "reasoned and credible" tactical decision not to call McCarthy as a witness. *Id.* at 59–60.

▇▇▇ Brown contends that this Court should not defer to the findings of fact of the Court of Appeal because the facts were not properly developed by the state court. Brown asserts that the Court of Appeal did not have before it the information contained in the declarations which accompanied the habeas petition filed in state court in May 1998 and that those declarations contradict statements made by Ms. West at the *Marsden* hearings. However, the petitioner is charged with due diligence to seek an evidentiary hearing and provide all factual predicates that could be discovered through due diligence. *See* 28 U.S.C. § 2254(e)(2), (e)(2)(A)(ii). The evidence submitted by Brown with his habeas petition could have been presented to the trial court. Moreover, as discussed above, the evidence submitted by Brown consists entirely of hearsay statements which do not undermine the sworn testimony to the contrary. Brown has failed to demonstrate that an evidentiary hearing is required under § 2254(e)(2).[22]

▇▇▇ With respect to the remaining ineffective assistance of counsel claims, Claims 2, 3, 4, 5, and 7, the factual bases for these claims were not developed in state court proceedings. However, petitioner cannot be barred from requesting

---

21. Petitioner concedes that fact finding on Claims 1 and 8 occurred in the two *Marsden* hearings held by the trial court. *See* Petitioner's Brief in Support of Motion for Evidentiary Hearing at 7.

22. On June 1, 2000, petitioner filed a motion for leave to conduct a deposition of King McCarthy. Petitioner contended that the deposition of McCarthy would yield substantial evidence in support of his request for an evidentiary hearing with regard to the allegations of ineffective assistance of counsel. The Court granted the motion to conduct a deposition and submit evidence in support of his request for an evidentiary hearing. Subse-

quently, petitioner filed three motions to extend the time set by the Court to submit additional evidence in support of the request for an evidentiary hearing due to habeas counsel's difficulty in locating Mr. McCarthy. The Court denied the third request for an extension of time on February 2, 2001, but noted that habeas counsel declared that she would continue to attempt to locate and depose Mr. McCarthy. Since that time, petitioner's habeas counsel has not sought leave to file additional information in support of the request for an evidentiary hearing or informed the Court whether she was able to locate and depose Mr. McCarthy.

an evidentiary hearing in federal court where petitioner exercised diligence by seeking an evidentiary hearing in state court in the manner prescribed by state law. *See Williams II*, at 437, 120 S.Ct. at 1490. Brown did request an evidentiary hearing in his habeas petition that was summarily rejected by the state Supreme Court. *See* Respondent's Exhibit H at 69. In this circumstance, where there has been no lack of due diligence at the relevant stages in the state proceedings, "the prisoner has not 'failed to develop' the facts under § 2254(e)(2)'s opening clause, and he will be excused from showing compliance with the balance of the subsection's requirements." *Williams II*, 529 U.S. at 437, 120 S.Ct. at 1491.[23]

■ Brown, however, must demonstrate that his request for an evidentiary hearing is required where "petitioner's allegations, if proved, would entitle him to relief." *See Turner v. Marshall*, 63 F.3d 807, 815 (9th Cir.1995) (internal quotation marks and citations omitted), overruled on other grounds by *Tolbert v. Page*, 182 F.3d 677 (9th Cir.1999) (en banc). With respect to the claims of ineffective assistance of counsel for failure to investigate and present evidence of petitioner's whereabouts, failure to present evidence to impeach Williams' testimony, failure to adequately

prepare and present defense witness testimony, failure to present eyewitness identification expert, and failure to move to strike Officer Blackwell's testimony, assuming that the testimony presented at the hearing would comport with the declarations provided by petitioner to support his habeas petition, Brown would not be entitled to relief. As discussed above, West's decisions in these areas were reasonable and/or did not prejudice Brown under the *Strickland* standard.

## CONCLUSION

For the foregoing reasons, Brown's petition for a writ of habeas corpus [docket #4] is DENIED. Brown's request for an evidentiary hearing [docket #24] is DENIED.

**IT IS SO ORDERED.**

---

**23.** The Court notes that the bases for these allegations—failure to investigate and present evidence of petitioner's whereabouts, failure to present evidence to impeach Williams, failure to adequately prepare and present defense witness testimony, failure to present eyewitness identification expert, and failure to move to strike Officer Blackwell's testimony—could potentially have been raised in the *Marsden* hearings, which took place after the guilt phase of the trial and after the penalty phase. However, petitioner may not have been able to identify and articulate these claims at that time without the assistance of new counsel. *See Bragg v. Galaza*, 242 F.3d 1082, 1090 n. 7

(9th Cir.2001) ("Ineffective assistance of counsel claims, unlike most claims alleging error at trial and sentencing, are best presented for the first time in collateral proceedings because in collateral proceedings new trial counsel can more effectively review the record and discover information regarding trial counsel error."). In this case, Brown did raise his IAC claims and request an evidentiary hearing during the state collateral proceedings. Therefore, the Court finds that Brown acted with requisite "diligence" in seeking to develop the factual record in the state proceedings.