Filed 10/10/23  P. v. Blackburn CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B320078 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA150229) |
| v. | |
| DIONTRE BLACKBURN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, John J. Lonergan, Judge.  Affirmed in part, vacated and remanded for resentencing.

Steven Schorr, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Idan Ivri, Supervising Deputy Attorney General, and Gabriel Bradley, Deputy Attorney General, for Plaintiff and Respondent.

**INTRODUCTION**

Defendant was charged with murder, attempted murder, and other crimes in connection with a car-to-car shooting. A jury determined he was the shooter and found him guilty on all counts. Before the jury rendered its verdict, the court became aware that three spectators associated with defendant had interacted with the jury outside the courtroom, which made several jurors uncomfortable. The court also discovered the jurors had discussed the spectators' conduct with each other. After examining each juror individually in chambers, the court found the jurors credible when they stated the interactions with the three spectators would not impact their ability to be fair and impartial to defendant. Also found credible were the jurors' assurances that the spectators' conduct would not factor into their determination of the charges against defendant. The court denied defendant's motions for a mistrial and new trial based on juror misconduct and ultimately sentenced him to a prison term of 50 years to life plus 24 years.

Defendant timely appealed. On appeal, he challenges the trial court's denial of his motions for a mistrial and new trial. He also argues the trial court committed several sentencing errors. We affirm the trial court's denial of the posttrial motions, vacate defendant's sentence, and remand the matter to the trial court for resentencing.

**FACTUAL AND PROCEDURAL BACKGROUND**

A.    *Background Facts and Charging Allegations*

On March 10, 2019, Kalease Patterson (Patterson) and Abdelhameed Ibrahim (Ibrahim) were driving through the Imperial Courts Housing Project in Los Angeles. At a stop sign, a white car pulled alongside the driver's side

of their car. A series of gunshots were fired from the white car into their car, killing Patterson, the driver, and injuring Ibrahim, who had been sitting in the front passenger seat.

In an information filed by the Los Angeles County District Attorney, defendant and appellant Diontre Blackburn (Blackburn) was charged with murder (Pen. Code § 187, subd. (a), count 1),[1] attempted murder (§§ 664/187, subd. (a), count 2), shooting at an occupied motor vehicle (§ 246, count 3), shooting from a motor vehicle (§ 26100, subd. (d), count 4), and possession of a firearm by a felon (§ 29800, subd. (a)(1), count 5). The information alleged a firearm enhancement under 12022.5, subdivision (a) in connection with each of the first four counts. It was also alleged that Blackburn had previously been convicted of burglary (§ 459), a serious felony constituting a "strike" under the "Three Strikes" law (§§ 667, subds. (b)-(j); 1170.12).


B.     *Evidence at Trial*
       1.     *Abdelhameed Ibrahim*

Ibrahim testified he was sitting in the passenger seat of a black[2] car being driven by Patterson. As they reached a stop sign near a hospital, he heard between eight and ten gunshots coming from his left. He was struck on his left arm and right wrist. He said the shots came from a "bright" colored four-door car that had pulled up next to the driver's side of Patterson's car. There was more than one person in the shooter's car, and the

---

[1]     All further unspecified statutory references are to the Penal Code.

[2]     Witnesses alternatively described the victims' car as black, green, dark green, or "dark colored."

3

person in the front passenger seat was shooting at Patterson's car. The shooter's car drove off down the street.

After the shooting, Ibrahim looked at Patterson in the driver's seat and asked him several questions, but Patterson only replied, "I don't know, bro," to each question before falling over in his seat.[3] The police arrived about a minute later.

### 2. *Detective Aaron Harrington*

Los Angeles Police Department (LAPD) Detective Aaron Harrington was one of the primary investigating officers. He interviewed Ibrahim after the shooting at Martin Luther King Hospital. During the interview, Ibrahim told him the gunshots came from the passenger seat of a white car with two occupants.

### 3. *Amadeo Sanchez Ayala*

Amadeo Sanchez Ayala (Ayala) lived near the intersection where the shooting occurred. Ayala testified he was inside when the shots were fired and came out to see what was going on. When he came outside, he saw a white car stopped next to a black car. He said there were two people in each car, and the passenger in the white car shot multiple times at the driver in the black car. He observed the passenger in the white car was an African-American male in his twenties with long hair. The white car drove away after the shooting. Police officers showed him photographs of different individuals, but he was unable to identify any of them as the shooter.

---

[3]     An autopsy revealed Patterson had been shot three times and died from the resulting gunshot wounds.

4

### 4. *Officer Darryl Danaher*

LAPD Officer Darryl Danaher (Officer Danaher) was assigned to the Southeast Division Camera Task Force, which monitors surveillance cameras in housing developments in southeast Los Angeles, including Imperial Courts. Officer Danaher looked at the recorded surveillance footage from the time of the shooting. Surveillance footage from multiple cameras was played for the jury and Officer Danaher testified as to the content of what was displayed in the footage. The footage showed a dark sedan passing by a group of people congregating in front of the Imperial Courts gymnasium shortly before the shooting. As it passed, the individuals gathered around the gymnasium started walking towards the car. Several of these people then got into cars and drove off in the same direction as the sedan. One of the vehicles was a white car with a male passenger dressed in black.

### 5. *Sergeant Robert Martinez*

LAPD Sergeant Robert Martinez (Sergeant Martinez) was assigned to gang enforcement detail in the Imperial Courts housing projects for four or five years. Over that time, Imperial Courts was his primary assignment and he was there daily. He became familiar with different members of the PJ Watts Crips gang in that area, including Blackburn, who went by the nickname "Dummy." He testified members of the gang would congregate outside the Imperial Courts gymnasium.

After responding to the scene of the shooting, Sergeant Martinez reviewed the surveillance footage from Imperial Courts. He said the footage showed Patterson's car briefly stop in front of the gymnasium before driving away. An individual dressed in black then got out of a white car, walked down the street in the direction of Patterson's car, and re-entered the white

5

car.  He acknowledged the man in black was very far away from the camera, but he stated there was a "high probability" that the footage depicted Blackburn because the individual in the footage "fit the physical descriptions of Mr. Blackburn" in terms of height, hairstyle, and stature.  He was able to identify other members of the gang from the footage based on his experience in the area.

Sergeant Martinez returned to Imperial Courts later that night and spoke to Blackburn, who was wearing clothing that was identical to what Sergeant Martinez had seen on the surveillance footage.  Sergeant Martinez's body-worn camera captured this encounter with Blackburn, and the footage was shown to the jury.

### 6.    *Ezekiel Gamboa*

Ezekiel Gamboa (Gamboa) is a convicted felon.  About three days after the shooting he was in police custody on a drug charge and asked to speak to the police about the shooting.  Detective Harrington interviewed Gamboa and the video of that interview was played for the jury.  In the interview, Gamboa said one of his neighbors, Kevin Sanchez, was friends with the person who did the killing.  He said he was standing next to his neighbor while he spoke to the killer using his speakerphone.  He heard the killer confess to the shooting during the phone call.  The killer said he was in front of the gymnasium before jumping in a car to pursue the victims.  He told Detective Harrington that the killer planned to leave for Las Vegas soon.  He also said he recognized the killer because they had known each other for more than ten years and identified him by the nicknames "Chapo" and "Dummy."  Gamboa knew the murder weapon was a .380 caliber pistol, which was information

the police had not made public. He identified a photograph of Blackburn as the killer.

At trial, Gamboa testified he did not recall making the statements in his interview because he was high on drugs when he made them. After the initial interview, Gamboa stopped cooperating with the police. He was detained and escorted to the preliminary hearing and trial. Gamboa also tried to leave the courthouse before taking the stand to testify at trial and was escorted back by Detective Harrington. On the stand, he acknowledged that individuals who testify at trial are labeled as "snitches" who get "dealt with" or "beat up." He said these consequences are "automatic . . . once you sit on the stand."

### 7. *Kevin Sanchez*

Kevin Sanchez (Sanchez) lived near the Imperial Courts housing project for several years. He and Gamboa were next-door neighbors. They saw each other nearly every day for over three to four years. Gamboa claimed to be associated with the PJ Watts Crips. Sanchez said Blackburn went by the nicknames "Dummy" and "El Chapo."

Sanchez was from the nearby Jordan Downs housing project and said he had formerly been associated with a criminal street gang in that area called the Southside Watts Varrio Grape. He said he had been physically assaulted while living near Imperial Courts and felt people in the neighborhood were trying to drive him out based on his affiliation with this other gang. He testified that Blackburn interceded on his behalf to stop the attacks against him.

A day or two before the shooting, Sanchez saw Blackburn in the neighborhood in the passenger seat of a white car. Police showed Sanchez a

7

photograph of a white car and he said he thought it was the same car he had seen Blackburn in before the shooting.  The photo of the car came from surveillance footage of the incident.

Sanchez communicated with Blackburn through phone calls, text messages, and Instagram messages.  The night of the shooting or the next day, Blackburn called Sanchez and told him, "I got into some shit," and said he needed to leave town and go to Las Vegas.  Sanchez denied that Blackburn ever said he had shot someone.  Sanchez also said Gamboa was not with him when this call occurred, but he told Gamboa about it afterward.

Months after the shooting, Sanchez was shot on the porch outside his house and thereafter moved to a different neighborhood out of fear that the PJ Watts Crips were going to kill him.

8. *Social Media Evidence*

Detective Harrington obtained a search warrant for Blackburn's Instagram account.  "El Chapo" was one of the names associated with his account.  Right before the shooting, Blackburn sent a message saying he was on his way to the area near the gymnasium at Imperial Courts.  About an hour after the shooting, Blackburn received a message on Instagram that said, "what u on fool" and Blackburn responded, "gang shit."  About six days after the shooting, Blackburn sent a message on Instagram saying he "got into a jamb" and "had 2 chill out for a few days" but was otherwise fine.  One of the Instagram messages sent by Blackburn contained his phone number.

9. *Cellular Phone Evidence*

Jeff Bennett (Bennett) worked for the Federal Bureau of Investigation in the Cellular Analysis Survey Team.  Using a technique called historical

cell site analysis, Bennett was able to determine that Blackburn's phone was near the crime scene about 45 minutes before the shooting. The analysis also indicated Blackburn's phone moved away from the crime scene shortly after the shooting. Bennett's analysis showed that from the evening of March 11, until the morning of March 13, Blackburn's phone was identified in Las Vegas.

### 10. *Defense Evidence*

Blackburn's counsel cross-examined the prosecution's witnesses but otherwise did not call any defense witnesses. Blackburn elected not to testify.

## C. *Jury Examination*

### 1. *Juror No. 7*

On March 9, 2022, after both sides had rested, the court received a note from the courtroom judicial assistant stating Juror No. 7 reported hearing spectators associated with Blackburn calling out "not guilty" as he was leaving the courthouse the previous day. The court informed counsel of the note and advised it would hold Juror No. 7 back after dismissing the jury for the day so the court and counsel could discuss the note with him.

Juror No. 7 was examined outside the presence of the jury with a court reporter present. He explained that as he was leaving the courthouse the previous day he heard voices behind him calling out "not guilty" trying to get his attention. He identified the speakers as two men who had been watching

9

the proceedings in the courtroom that day.[4] Juror No. 7 did not respond and kept walking. He did not believe the men were trying to intimidate him and told the court, "[W]ell, it could have been an intimidation thing or whatever. But I wasn't taking it like that." He brought the issue up with the court because at the lunch recess that afternoon he had been talking to an attorney[5] in the courthouse cafeteria, and that attorney told him that he might want to inform the court of what had happened.

The court asked Juror No. 7 if the encounter would impact his ability to base his decision in this case only on the evidence he heard in the courtroom. Juror No. 7 said he was "very, very certain" that he would be able to do so and assured the court the encounter "would not cause me not to do my due diligence here with you." Counsel for Blackburn asked Juror No. 7 "Do you feel okay safetywise?" Juror No. 7 answered, "Oh, yeah." Counsel asked if Juror No. 7 would hold the incident against Blackburn and Juror No. 7 said that he would not.

Counsel for the prosecution asked Juror No. 7 if he would allow anything that happened outside of the courtroom to affect his decision about the evidence and Juror No. 7 affirmed that he would not. When instructed by the court not to discuss the event with the other jurors, Juror No. 7 stated he had already done so, and indicated other jurors had interactions with a female spectator who had been invading jurors' space and walking unusually

---

[4]    These two men were never identified by name, and the nature of their affiliation with Blackburn is not clear from the record. However, it appears the court and counsel understood them to be supporters of Blackburn who had come to watch his trial with some regularity.

[5]    The attorney was not identified, but Juror No. 7 made it clear he was not one of the attorneys involved in this case.

10

close to them in the hallways. This woman was later identified outside the presence of the jury as Blackburn's girlfriend, Tamera Russ (Russ).[6] Juror No. 7 also said he had previously noticed the same two men in the area where the jury congregated in the hallway outside the courtroom.

The court dismissed Juror No. 7 and discussed the matter with counsel, stating they would poll each juror the next day and "go from there."

### 2. *Remaining Jurors*

On March 10, the court called each of the remaining eleven jurors individually into chambers with counsel and with a court reporter present. Each examination began with the court generally asking the jurors whether they had witnessed any statements or conduct that made them feel uncomfortable, such as individuals speaking to them about the case or walking unusually close to them. What follows is a summary of each examination.

### a. *Juror No. 1*

Juror No. 1 stated she thought Russ may have taken a photograph outside of the courtroom but did not know who she had photographed. Juror No. 1 stated, "I'm a little leery," but otherwise said she would be able to set aside the incident. It would not impact her job as a juror, and she would decide the case solely based on the evidence put before the jury in the courtroom.

---

[6] The jurors were not informed of Russ's name or connection to Blackburn. For the sake of clarity, we will use Russ's name in summarizing the reports of the jurors, though no juror identified her by name.

b.    *Juror No. 2*

At the beginning of questioning, Juror No. 2 stated she was feeling "nervous," and the court noted that she was "getting a little bit emotional here." Juror No. 2 informed the court that Russ had been walking very close to her outside the courtroom during breaks in the trial. Russ would also walk directly at her and force Juror No. 2 to move out of the way to avoid a collision. At first, Juror No. 2 assumed Russ was simply distracted by her phone and was not paying attention to where she was walking, but it happened every day, and Juror No. 2 began to take note. She mentioned that on three occasions she went into the courthouse restroom and noticed Russ using the stall right next to her. Juror No. 2 also said she ate her lunch in her car in the courthouse parking lot. On one occasion, Juror No. 2 noticed Russ was parked right behind her. She did not know if Russ knew she was parked in front of her. However, Juror No. 2 decided to wait until Russ left the parking lot to get out of her car to return to court because she felt uncomfortable.

Juror No. 2 did not raise these issues with the court because she was not sure if she was "being paranoid or overthinking it" and decided to just "let it go." She figured these incidents were unimportant because her job was to base her decision on the evidence introduced in court and nothing else. She initially did not talk about the spectators to any other jurors until the issue came up the day before. Juror No. 2 indicated she understood Russ's conduct "has nothing to do with Mr. Blackburn" and stated, "I will not let that have anything to do with my decision based on the facts and the evidence."

c.    *Juror No. 3*

Juror No. 3 did not have any incidents to report to the court.

12

d.    *Juror No. 4*

Juror No. 4 said the only time she felt uncomfortable was when the two gentlemen identified by Juror No. 7 came towards the area where the jury assembled in the hallway and started playing music on a phone while sitting nearby.  She was confused by their behavior and described it as "just awkward" but stated they did not do anything "directly to me."  She said their conduct would not influence her decision as a juror; she would decide the facts only on the evidence presented in the courtroom.  She also stated she understood Blackburn and his counsel did not have anything to do with the conduct of these two men.

At one point Juror No. 4 indicated she was "very emotional" and stated, "It's too much."  She explained these feelings were not as a result of the conduct she had witnessed from the two spectators.  The case had caused memories to resurface of a time when she was "falsely accused" of a crime as a juvenile solely because of the clothing she had worn.  She said she failed to mention this experience during jury selection because she had blocked it out.  She assured the court this experience would not impact her ability to be impartial, stating, "I need to set it aside which is what I said from the get-go.  I'm setting it aside.  I'm saying that's what's making it hard.  But we are looking at all the evidence.  That's what I'm focusing on.  I said that's why I'm emotional.  It came back when I had blocked that out."

e.    *Juror No. 5*

Juror No. 5 heard from the other jurors of their own experiences but had no personal contact with the spectators.

13

### f. *Juror No. 6*

Juror No. 6 saw Russ walking near Juror No. 11 in the hallway and stated Russ "shouldered" Juror No. 11. Juror No. 6 described this as "offensive body language" and "derogatory" but stated it was "not going to affect me in any way." Juror No. 6 understood the incident had nothing to do with Blackburn.

### g. *Juror No. 8*

Juror No. 8 witnessed the two male spectators in the vestibule taking pictures of the interior of the courtroom after the jury had left for lunch. Juror No. 8 stated the incident would not affect his ability to be a juror and that he would decide the case based only on the evidence presented in the courtroom. Juror No. 8 also agreed the spectators' behavior had nothing to do with Blackburn.

### h. *Juror Nos. 9 and 10*

Jurors Nos. 9 and 10 had not observed anything unusual or any conduct that made them uncomfortable.

### i. *Juror No. 11*

Juror No. 11 corroborated Juror No. 4's report that on one occasion, the two male spectators had sat in the hall playing music, near the area where the jury congregated. Juror No. 11 felt from their body language that they were speaking to each other about the jurors and were playing music so no one would hear what they were saying. She acknowledged there was also an incident where Russ got close to her in the hallway, but contrary to Juror No. 6's report, Juror No. 11 said Russ "accidentally just hit my bag. She didn't

14

really shoulder bump me but I thought it was my bag." She said neither incident would affect her ability to do her job as a juror and understood they had nothing to do with Blackburn.

### j. *Juror No. 12*

Juror No. 12 saw the two male spectators briefly enter the hallway where the jurors gathered before leaving "right away." Juror No. 12 indicated the incident would not prevent him from serving as a juror and would not be considered when deciding the case.

### D. *Motion for Mistrial*

After the court completed its examination of the jurors, Blackburn's counsel made an oral motion for mistrial, arguing that while no single incident reported by an individual juror required a mistrial, their experiences, taken cumulatively, must have biased the jurors against Blackburn. Alternatively, he requested jurors 1, 2, 4, 6, 7, 8, and 11 be excused, which would require a declaration of a mistrial as there were not enough alternate jurors to replace them. The court denied the motion and noted "each and every juror after [having been] asked several times indicated it would have no influence on their role as a juror," and that every juror had stated "they could be fair and impartial on this case."

### E. *Examination of Tamera Russ*

While the jury was deliberating, the court questioned Russ outside the presence of the jury, with counsel present. Russ identified herself to the court. The court noted it admonished all spectators, including Russ, to have no contact with the jury or congregate near the jury in the courthouse

hallway. The court advised Russ that several jurors had indicated Russ had been brushing up against them in the hall or walking very close to them and had potentially been photographing jurors. The court asked Russ to turn over her phone so the court could examine it for photographs. Russ denied photographing jurors but turned her phone over to the court.

The court examined the phone but noted "I can't tell how this is organized." The court concluded "[W]hile I did look at her phone, it was not formatted in the type of phone that I'm used to as far as photos, but everything that I saw had nothing to do with court. And I don't know if it was the proper file."[7] The court returned the phone to Russ and ordered her to leave the courthouse for the remainder of the trial.

### F. *Verdict*

The jury returned a verdict finding Blackburn guilty on all five counts. The jury also found true the allegations as to counts 1 through 4 that he used a firearm under section 12022.5, subdivision (a). The court dismissed the jury and scheduled a sentencing hearing and prior conviction (or "strike") trial.

### G. *Motion for New Trial*

After the jury rendered their verdict, Blackburn filed a motion for a new trial alleging insufficient evidence under section 1181, subdivision (6) and juror bias under subdivision (3). The court rejected both bases for the motion. In its ruling, the court explained it found the jurors were credible in

---

[7] At a subsequent hearing, the court noted Russ's phone showed she had been taking photographs in the courthouse and courtroom vestibule, but these photos were self-portraits which did not include jurors.

stating the conduct of Russ and the two male spectators would not impact their ability to be fair and impartial in deciding the case: "I can't be more clear that the court inquired, looked at their demeanor, asked them questions, how they felt and not one juror exhibited a feeling of fear for being a juror on this case based on what they may have observed outside the courtroom or from spectators in the courtroom. They voiced certain concerns, but when follow-up questions were added, each and every one said yes, perhaps they were misinterpreting, overexaggerating, et cetera. But at the end of the day the court felt that each and every juror—the court was satisfied they could perform their job."

The court also noted it was in the best position to judge the credibility of the jurors and had made this determination "after seeing them in person, not on the transcript, not trying to interpret what they meant on a transcript, but being close to them in chambers with counsel asking them the questions, making sure that they can still do their job in every day of this trial."

H.    *Sentencing*

At the sentencing hearing on April 28, Blackburn admitted the prior burglary conviction as a prior strike and waived any trial on this issue. On the first count for first-degree murder, the court sentenced Blackburn to 25 years to life, which was doubled to 50 years to life due to the admitted prior strike, and said the ten-year firearm enhancement under section 12022.5, subdivision (a), was stayed or would run concurrently. On the second count for attempted murder, Blackburn was sentenced to seven years, which was doubled to 14 years because of the prior strike. Ten years were then added for the section 12022.5 enhancement for a total sentence of 24 years to run consecutive to his term under count 1. The court imposed additional prison

17

terms for counts 3, 4, and 5, but ordered each of them stayed under section 654.

I.    *Appeal*

Blackburn filed a timely notice of appeal on April 28, 2022.  On appeal, Blackburn challenges the denial of his motion for mistrial, or alternatively, to dismiss jurors 1, 2, 4, 6, 7, 8, and 11.  He also challenges the denial of his motion for a new trial but only as to his claim of juror bias under section 1181, subdivision (3).  Blackburn also alleges sentencing error, and the parties agree remand for resentencing is appropriate.

**DISCUSSION**

A.    *Legal Standards Governing Allegations of Juror Misconduct*

When a juror "shares improper information with other jurors, the event is called juror misconduct." (*In re Hamilton* (1999) 20 Cal.4th 273, 294 (*Hamilton*).)  "Misconduct by a juror, or a nonjuror's tampering contact or communication with a sitting juror, usually raises a rebuttable 'presumption' of prejudice." (*Id.* at p. 295.)  "A sitting juror's involuntary exposure to events outside the trial  evidence, even if not 'misconduct' in the pejorative sense, may require similar examination for probable prejudice." (*Id.* at pp. 294– 295.)  However, "prejudice is not presumed when spectators misbehave during trial; rather, the defendant must establish prejudice." (*People v. Cornwell* (2005) 37 Cal.4th 50, 88, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

The actions taken by Russ and the two males, taken in isolation, would constitute spectator misconduct which does not give rise to a presumption of prejudice.  However, it became clear during Juror No. 7's examination that

the jurors had discussed among themselves their own experiences with Russ and the two males. By discussing these outside events among themselves, the jurors shared improper information, which is misconduct giving rise to a presumption of prejudice. (*Hamilton*, *supra*, 20 Cal.4th at p. 294.)

This "presumption of prejudice is rebutted, and the verdict will not be disturbed, if the entire record in the particular case, including the nature of the misconduct or other event, and the surrounding circumstances, indicates there is no reasonable probability of prejudice, i.e., no *substantial likelihood* that one or more jurors were actually biased against the defendant." (*Hamilton*, *supra*, 20 Cal.4th at p. 296.) This test is a "pragmatic one" which acknowledges it is "'virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote' [citation]." (*Ibid*.) The entire record must be reviewed to determine whether there is a substantial likelihood of bias, including "the nature of the juror's conduct, the circumstances under which the information was obtained, the instructions the jury received, the nature of the evidence and issues at trial, and the strength of the evidence against the defendant." (*In re Carpenter* (1995) 9 Cal.4th 634, 654.) "'[A] finding of "inherently" likely bias is required when, but only when, the extraneous information was so prejudicial in context that its erroneous introduction in the trial itself would have warranted reversal of the judgment.' [Citation.] Moreover, we do not reverse unanimous verdicts because there is *some* possibility the juror was improperly influenced." (*People v. Danks* (2004) 32 Cal.4th 269, 305.)

"As we have consistently stated in numerous contexts we generally presume that jurors are capable of following, and do follow, the trial court's instructions." (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 447.) As a result, courts have held this presumption of prejudice may also be

rebutted through admonitions or instructions given by the court. (See, e.g., *People v. Pinholster* (1992) 1 Cal.4th 865, 927 [admonition to the jury was sufficient to rebut the presumption of prejudice arising from juror's misconduct, disapproved on other grounds by *People v. Williams* (2010) 49 Cal.4th 405, 459; *People v. Craig* (1978) 86 Cal.App.3d 905, 919 (*Craig*) [immediate admonishment cured potential prejudice]; *People v. Harper* (1986) 186 Cal.App.3d 1420, 1426–1430 [prompt admonition not to consider extraneous material rebutted the presumption of prejudice].)

     B.    *Motion for Mistrial*

"A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions." (*People v. Dalton* (2019) 7 Cal.5th 166, 240, internal citation and quotation marks omitted.) On appeal, the determination of whether jury misconduct was prejudicial presents a mixed question of law and fact "'subject to an appellate court's independent determination.'" (*People v. Danks, supra,* 32 Cal.4th at p. 303.) "We accept the trial court's factual findings and credibility determinations if supported by substantial evidence." (*People v. Tafoya* (2007) 42 Cal.4th 147, 192.)

The totality of the circumstances convinces us there was no substantial likelihood that the jury was prejudiced against Blackburn. It bears repeating that the only misconduct by the jury was in discussing the conduct of the spectators. The record before us does not suggest the jury discussed this conduct as a basis for determining Blackburn's guilt, but rather because the conduct of Russ and the two unidentified men was so de minimis that the

jurors were unsure it rose to the level of improper conduct or if they were reading too much into vague albeit unusual behavior on the part of these spectators.

We note the jurors did not conceal these discussions from the court. Juror No. 7 readily admitted he had already discussed the incident with fellow jurors and volunteered the other discussions the jurors had without prompting from the court. All of the jurors were examined by the court with counsel present, and all agreed these events were not attributable to Blackburn, that Blackburn had no control over the conduct of these individuals, and the behavior would not impact their determination of Blackburn's guilt or innocence. The trial court was in the best position to judge the credibility of the jurors. On review we defer to the trial court's credibility determinations on such issues when they are supported by substantial evidence. In this instance, the court's credibility determinations were supported by substantial evidence in the form of the assurances provided by each juror during the court's examination. (*People v. Harris* (2008) 43 Cal.4th 1269, 1305 [a juror's "emphatic and repeated assurances" of impartiality are "substantial evidence" supporting a trial court's credibility determination].)

Important here, the court immediately took curative action as soon as it became aware of the potential misconduct. It examined each juror in chambers with counsel and a court reporter present to make a record. During its investigation, the court expressly reminded the jurors the actions of the spectators could not be attributed to Blackburn and that Blackburn had no control over them. The jurors clearly and unequivocally indicated they understood this distinction. The court also admonished the jury not to consider these events in deliberating on the charges against Blackburn, and

21

the jurors agreed the circumstances would not prevent them from deciding the case based only on the evidence introduced at trial and the instructions on the law from the court. "[T]he court's immediate admonition, along with the jury's negative response sufficiently shows nonprejudice. Any misconduct being sufficiently cured, there was no error in denying a motion for mistrial." (*Craig*, *supra*, 86 Cal.App.3d at p. 919.)

Whether it is analyzed as juror misconduct or spectator misconduct, the actions at issue here fall well below the level of conduct which has been held insufficient to create a substantial likelihood of prejudice. In *Hamilton*, a juror witnessed the defendant's sister and her boyfriend parked in the alley outside her house in the evening after trial. (*Hamilton*, *supra*, 20 Cal.4th at p. 304.) The two sped away when they saw the juror. The juror did not report the incident to the court but called her friend, who worked as a police dispatcher, to request increased police patrols near her home. (*Ibid*.) The juror admitted she was afraid of the defendant's family, including his sister, and that "other jurors had expressed such concerns among themselves." (*Id*. at p. 287.) The juror "avoided going to the courthouse restroom alone, and jurors tended to band together to walk to the parking lot." (*Ibid*.) The California Supreme Court found that under the totality of these circumstances, there was "no substantial likelihood" that the incident caused the juror to develop actual bias against the defendant. (*Id*. at p. 306.)

In *People v. Panah* (2005) 35 Cal.4th 395 "some supporters of defendant were following or 'shadowing' the jurors during breaks in their deliberations, while others, including his mother, were clustering near the jury while it was assembling on breaks." (*Id*. at p. 480.) A juror told the bailiff "she felt intimidated by the presence of defendant's supporters, particularly his mother. The bailiff noted that he had also overheard a male juror express

22

relief that the jury no longer had to assemble 'on the sixth floor,' presumably to avoid contact with defendant's supporters." (*Ibid*.) The California Supreme Court nonetheless found no evidence of bias or prejudice by the jurors, finding "There is no evidence the jury was biased against defendant, his mother, or his supporters, much less that such bias infected its deliberations. . . . The jurors' understandable concern does not amount to misconduct, and there is nothing on the record to support defendant's claim that he was denied an impartial jury." (*Ibid*.)

In *Brown v. Terhune* (N.D. Cal. 2001) 158 F.Supp.2d 1050, a trial observer had entered an elevator with several jurors and told them, "'You better not convict an innocent man. You better not convict an innocent man.'" (*Id*. at p. 1081.) The district court rejected a petition for a writ of habeas corpus based, in part, on this incident. The court noted the California appellate court had properly determined any potential prejudice was cured by the trial court's admonition to the jury, even in the absence of any evidentiary hearing or investigation into bias by the court. (*Id*. at pp. 1081–1082.)

In *People v. Currie* (1934) 3 Cal.App.2d 31, a witness accosted two jurors during a break in trial and pleaded with them to find defendant guilty, saying she was a widow and had lost all her money because of defendant's false representations. (*Id*. at p. 33.) The court learned of the incident before the case was submitted to the jury but did not admonish the jurors to disregard the remarks in deciding the case. (*Ibid*.) The Court of Appeal affirmed the denial of defendant's motion for new trial, holding that, while the judge should have admonished the jury, it could not say the verdict was the result of prejudice. (*Id*. at p. 34.)

Blackburn assigns undue importance to the events reported by the jury. He claims the spectator's conduct made the jurors feel intimidated or fearful. These characterizations are wholly speculative and unsupported by the record. None of the jurors stated they were afraid of Blackburn or that the incidents with Russ and the two men made them feel intimidated. The juror who had the most contact with the spectators, Juror No. 7, expressly stated he did not feel they were trying to intimidate the jury and said he did not have any concerns about his safety.

While the record indicates Juror No. 2 was "emotional" and "nervous" during her examination by the court, it is unclear from the record what, precisely, she was nervous about. She could have been referring to the general stress of being a juror in a murder trial, or she could have been describing the anxiety of being called into chambers for a transcribed interrogation with the court and two attorneys. Neither the court, prosecution, nor Blackburn's counsel felt it necessary to interrogate the meaning or cause of her nervousness, and Juror No. 2 ultimately stated she would not let the spectators' conduct influence her deliberations. As we have stated, the trial court was in the best position to judge Juror No. 2's credibility in making this statement, and its determination that she was credible is supported by substantial evidence in the form of her assurances of impartiality. The record does not support the conclusion that she harbored a hidden bias against Blackburn.

Juror No. 1 stated she was "leery" of the situation. This indicates suspicion, not fear. The record indicates the spectators acted in an unusual and inappropriate manner, and the jurors and court were right to be suspicious of their conduct. The record before us does not permit the

24

conclusion that this suspicion was attributable to bias against Blackburn or that there was a substantial likelihood the jury was prejudiced against him.

Blackburn argues the jury was biased against him because it was aware of his gang connections. Blackburn contends that because the evidence introduced at trial indicated he was in a gang, the jurors all assumed that Russ and two male spectators were associated with a gang as well, and must have understood their conduct as attempts to threaten or intimidate them. This too is unsupported by the record. The jury did not act in a way that indicated they were intimidated or fearful. They voted to convict Blackburn, which itself is incompatible with the notion that they felt scared of Blackburn or his associates. None of the jurors made any reference to gangs or Blackburn's gang affiliation in their examinations in chambers. None of the jurors indicated they felt scared or intimidated.

In the absence of any overt statements or actions even suggesting such juror bias, Blackburn in essence argues that we must assume a jury is irrefutably prejudiced against any defendant who has connections to a gang. If we were to accept Blackburn's reasoning, a gang member could effectively avoid any criminal conviction by simply testifying that he or she was a member of a gang and having associates make contact with the jury. Under Blackburn's reasoning, the court in such a situation would be forced to find this knowledge had irrevocably prejudiced the jury against the defendant and declare a mistrial. We decline Blackburn's invitation to immunize gang members from criminal prosecution in this manner.

For this precise reason, the California Supreme Court has noted it remains an open question as to whether such misconduct can ever be grounds for relief: "[W]e question whether a convicted person can ever overturn the verdict on grounds that persons *acting in his behalf* deliberately sought to

influence the jury. Certainly no such claim could ever be valid where the *accused himself* had instigated the incident; a party cannot profit by his or her own wrongdoing. But even where, as here, there is no evidence petitioner was directly involved, recognition of such a claim suggests tempting opportunities for accuseds' allies to manufacture challenges against subsequent convictions." (*Hamilton*, 20 Cal.4th at p. 305.) Ultimately, we need not resolve this question as we find the jurors' unequivocal assurances and the trial court's admonitions and instructions rebut any potential prejudice flowing from the actions of the spectators.

Finally, Blackburn argues that even if no individual instance of misconduct was sufficient to show bias or prejudice, the cumulative effect of the spectators' conduct must have influenced the jury. We reject this contention. "We likewise hold the cumulative effect of claimed juror and spectator misconduct insufficient to constitute a denial of a fair trial. There simply was no showing of prejudice, other than by speculation of defense counsel, which speculation was easily overcome by the actions of the trial court." (*Craig, supra*, 86 Cal.App.3d at p. 920.)

On these facts, we find no substantial likelihood that the jury's verdict was the result of bias against Blackburn and affirm the trial court's denial of his motion for a mistrial.

C.    *Motion for New Trial*

"[A] new trial will not be granted simply because remarks were made during the trial to jurors, or within range of their hearing, by strangers to the litigation, where neither the successful party nor the jurors were at fault, unless such remarks probably influenced the verdict." (*People v. Slocum* (1975) 52 Cal.App.3d 867, 884.) While "[c]ourts have stressed the particular

26

need for independent review of the trial court's reasons for *denying* a new trial motion in *juror bias* cases," this rule has not been consistently applied and some modern authorities suggest a deferential abuse of discretion standard applies instead. (*People v. Ault* (2004) 33 Cal.4th 1250, 1262 and fn. 7 [collecting cases].) We do not need to resolve this question, as we find the trial court's denial of Blackburn's motion for a new trial would be affirmed under an independent review standard.

Section 1181 sets forth various grounds on which a motion for a new trial may be made. Section 1181, subdivision (3) provides a new trial may be granted "[w]hen the jury has separated without leave of the court after retiring to deliberate upon their verdict, or been guilty of any misconduct by which a fair and due consideration of the case has been prevented." Subdivision (6) allows for a new trial where the "verdict or finding is contrary to law or evidence." Blackburn's motion below asserted both bases for relief. On appeal, Blackburn only challenges the trial court's denial of the motion under subdivision (3).

Blackburn concedes the motion for a new trial under section 1181, subdivision (3) is based on the same grounds and arguments as his motion for a mistrial. However, in his briefing on this motion, Blackburn raises two additional arguments we have not already addressed in connection with his motion for mistrial: (1) the jury must have been biased against him because it returned a guilty verdict within a few hours of deliberation, and (2) the evidence presented by the prosecution did not dispositively prove Blackburn was the shooter. In other words, Blackburn argues the evidence was not strong enough to support such a short deliberation, and the short deliberation must instead be attributed to jury prejudice. We reject this claim.

27

There was no footage of the shooting itself, nor were there any eyewitnesses who identified Blackburn as the shooter. The evidence presented by the prosecution was circumstantial, but it was not so weak as to suggest bias had any role in the jury's verdict. There was ample evidence pointing to Blackburn as the shooter. While the interview of Gamboa and testimony of Sanchez raised credibility issues, each was corroborated to some extent by the social media and cellphone evidence presented by the prosecution, which showed Blackburn was in the area at the time of the shooting and shortly thereafter went to Las Vegas. Gamboa was also able to correctly identify the caliber of handgun used in the shooting, even though that was not public information. Even if the quality of the surveillance footage did not allow for a dispositive identification of Blackburn as the individual who entered the passenger seat of the white car, it was not unreasonable for the jury to credit Sergeant Martinez's identification of Blackburn based on his many years of interactions with him. This identification was also corroborated by the cellular phone analysis, which showed Blackburn was in the area at that time. There was also the testimony of Alaya, who stated the shots came from the passenger seat of the white car and offered a description of the shooter which was consistent with Sergeant Martinez's identification of Blackburn.

Even upon an independent review, we find this circumstantial evidence was sufficient to support a guilty verdict after only a few hours of deliberation and do not find any basis to conclude it was the result of juror bias or prejudice against Blackburn. For these reasons, we affirm the trial court's denial of Blackburn's motion for a new trial under section 1181, subdivision (3).

D.    *Sentencing Error*

The parties agree the trial court committed sentencing error and that remand for resentencing is appropriate, though they disagree as to what those errors were.  We agree remand for resentencing is appropriate.

1.    *Counts 3 and 4*

At the April 28, 2022, sentencing hearing, the court issued the following sentences on count 3 (shooting at an occupied motor vehicle) and count 4 (shooting from a motor vehicle):  "As to count 3, that 20 years is imposed and stayed pursuant to 654 of the Penal Code.  [¶]  Same thing with count 4.  Fourteen years is imposed and stayed pursuant to Penal Code section 654."  The record does not indicate how the trial court arrived at the 20- and 14-year sentences on these counts, but it appears the court adopted the proposals in the prosecution's sentencing memorandum.  The sentencing memorandum proposed a middle term of five years on count 3, which was doubled to ten years for the prior strike, with an additional ten years imposed for the firearm enhancement under section 12022.5, subdivision (a), for a total sentence of 20 years.  As to count 4, the sentencing memorandum proposed the middle term of two years, doubled to four years for the prior strike, with an additional ten years imposed for the firearm enhancement under section 12022.5, subdivision (a), for a total of 14 years.

Subject to exceptions that are not applicable here, a section 12022.5, subdivision (a) "enhancement does not apply if firearm use is an element of the underlying offense."  (*People v. Kramer* (2002) 29 Cal.4th 720, 723, fn. 2.) Firearm use is an element of both count 3 and count 4.  (§ 246 ["Any person who shall maliciously and willfully discharge a firearm at an . . . occupied motor vehicle . . . is guilty of a felony"]; § 26100, subd. (d) ["any person who

29

willfully and maliciously discharges a firearm from a motor vehicle is guilty of a public offense"].)  The trial court thus erred in imposing ten-year firearm enhancements on counts 3 and 4 under section 12022.5, subdivision (a).

### 2.  *Count 1*

On count 1 (murder), the trial court sentenced Blackburn to 25 years to life, which was doubled to 50 years to life due to the prior strike.  The court also imposed a ten-year enhancement under section 12022.5, subdivision (a).  Initially, the court indicated the ten-year enhancement would run concurrently with the sentence of 50 years to life, then later stated it was staying the enhancement under section 12022.5.

By its express terms, section 12022.5, subdivision (a) provides for "an additional and consecutive term of imprisonment" and does not permit a court to impose this enhancement concurrently.  Section 12022.5, subdivision (c) gives the court the discretion to "strike or dismiss an enhancement otherwise required to be imposed by this section" in the interest of justice. (§ 12022.5, subd. (c).)  Read together, subdivisions (a) and (c) gave the court the option of imposing a consecutive term on the enhancement or exercising its discretion to dismiss or strike it.  However, the trial court could not stay the enhancement or impose it concurrently.  (*People v. Lopez* (2004) 119 Cal.App.4th 355, 364 ["[t]he trial court has no authority to stay an enhancement, rather than strike it . . . when the only basis for doing either is its own discretionary sense of justice"].)  We conclude the trial court erred in its sentencing on count 1 by attempting to stay the section 12022.5 enhancement or impose it concurrently.

### 3.	*Count 5*

It also appears the trial court may have erred in imposing its sentence on count 5 for possession of a firearm by a felon (§ 29800, subd. (a)(1)).  At Blackburn's sentencing hearing, the court imposed a sentence of six years on count 5, which it then stayed under section 654.  In imposing this sentence, the trial court did not explain how it arrived at this term.  A violation of section 29800 is punishable by a term of imprisonment of 16 months, two years, or three years.[8]  (§§ 29800; 18, subd. (a).)

The prosecution's sentencing memorandum proposed a term of six years on count 5, though this was the result of a mathematical error.  The memorandum proposed the middle term of two years, which then would be doubled due to Blackburn's prior strike.  However, it mistakenly calculated this would result in a total sentence of six years rather than four years.  Alternatively, the court could have correctly imposed the upper term of three years on this count, which would then be doubled to six years for the prior strike.

We cannot determine on the record before us whether the court intended to impose a sentence on the upper term of count 5, or if it mistakenly adopted the mathematical error contained in the prosecution's sentencing memorandum.  As it appears the court followed the prosecution's sentencing memorandum on counts 3 and 4, we cannot discount the possibility that the court similarly followed the memorandum in issuing the sentence on count 5 and mistakenly adopted the prosecution's mathematical

---

[8]	The minute order issued after the sentencing hearing conflicts with the sentence as announced by the court at the April 28 hearing.  Rather than a term of six years, the order reflects a sentence of 16 months on count 5, which was calculated as one-third of the middle term of two years—or 8 months— which was then doubled to 16 months due to the prior strike.

error.  Because we find remand for resentencing is appropriate due to the errors concerning counts 1, 3, and 4, we need not determine whether the sentence on count 5 was the result of error.

### 4. *Remand is Appropriate*

As we have found the trial court erred in imposing its sentences on counts 1, 3, and 4, we vacate Blackburn's sentence and remand for resentencing as requested by both sides.  Given the need for resentencing, we decline to reach Blackburn's remaining claims of sentencing error.  On remand, Blackburn may raise these issues before the trial court.  (*People v. Valenzuela* (2019) 7 Cal.5th 415, 424–425 ["the full resentencing rule allows a [trial] court to revisit all prior sentencing decisions when resentencing a defendant"]; *People v. Ramirez* (2019) 35 Cal.App.5th 55, 64; accord, *People v. Buycks* (2018) 5 Cal.5th 857, 893.)

## DISPOSITION

We affirm the trial court's rulings on Blackburn's motions for a mistrial and new trial.  We also vacate Blackburn's sentence and remand this matter to the trial court for resentencing.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ZUKIN, J.

WE CONCUR:

CURREY, P. J.                              MORI, J.

32